**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

# FEDERAL LAWSUIT OF DISCRIMINATION, RETALIATION, TEXAS TORT PERSONAL INJURY, GROSS NEGLIGENCE & INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**JANE DOE**
*Texas Southern University*
**Student |Plaintiff | Complainant | Pro Se Litigant**

*This page is intentionally left blank.*

# TABLE OF CONTENTS

**I.** PRELIMINARY STATEMENT ................................ 1

**II.** JURISDICTION AND VENUE ............................ 5

**III.** PARTIES ............................................................ 6

**IV.** SERVICE ........................................................... 7

**V.** FACTS ................................................................ 8

    **A.** SPRING 2018 ............................................ 9

    **B.** FALL 2018 ............................................... 14

    **C.** SPRING 2019 ........................................... 23

**VI.** HISTORY OF TEXAS SOUTHERN ................... 65

**VII.** CAUSES OF ACTION ...................................... 72

**VIII.** JURY TRIAL DEMAND ................................. 81

**IX.** DAMAGES ........................................................ 81

**X.** PRAYER ........................................................... 82

*This page is intentionally left blank.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **JANE DOE,**<br>*Plaintiff,*<br><br>v.<br><br>**TEXAS SOUTHERN UNIVERSITY, TEXAS SOUTHERN UNIVERSITY'S BOARD OF REGENTS, DEPARTMENT OF PUBLIC SAFETY, THURGOOD MARSHALL SCHOOL OF LAW & HOUSTON'S LOUIS STOKES ALLIANCE FOR MINORITY PARTICIPATION**<br>*Defendants.* | DOCKET NO.:<br><br>**CIVIL ACTION NO.:**<br><br><br><br>**[JURY TRIAL DEMANDED]** |

# PLAINTIFF'S ORIGINAL COMPLAINT

*TO THE HONORABLE JUDGE OF SAID COURT:*

COMES NOW, Plaintiff Jane Doe,[1] through Pro Se Litigant filing her Original Complaint against Texas Southern University (hereinafter "Texas Southern", "TSU" or "the University"), Texas Southern University's Board of Regents (hereinafter "the Board"), Department of Public Safety (hereinafter "TSU-PD" or "TSU Police Department"),

---

[1] "Jane Doe" has been substituted for the Plaintiff's name for all causes of action brought through this Complaint which would otherwise publish important privacy interests of all parties. Plaintiff fears for her life, emotional, mental and physical well-being personal safety as well as that of her family as a result of this Complaint. Since complaining to the University of claims set forth in this Complaint, Plaintiff has received vile threats and has been harassed. In this, Plaintiff will file a Motion to Proceed with Fictitious Names or Pseudonymously.

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

Thurgood Marshall School of Law (hereinafter "Thurgood Marshall" or "the Law School") and Houston's Louis Stokes Alliance for Minority Participation (hereinafter "H-LSAMP") in support thereof would show as follows:

# I. PRELIMINARY STATEMENT

Plaintiff Jane Doe, a now former student of Texas Southern University petitions this Federal lawsuit charging Defendants Texas Southern University, Texas Southern's Board of Regents, Texas Southern's Department of Public Safety, Texas Southern's Law School, Thurgood Marshall School of Law and Houston's Louis Stokes Alliance for Minority Participation with perpetuating and subjecting Plaintiff to a discriminatory, retaliatory, hostile educational atmosphere wherein Plaintiff faced sexual harassment, sex-based discrimination, sexual assault, race, color and national origin-based discrimination, disability-based discrimination, exclusion in Federally funded educational programs on the basis of protected classes, protected activity and protected speech, the denial of institutional educational rights, retaliation for attempting to resist same and retaliatory harassment for Plaintiff, Jane Doe's subsequent participation and sensitive claims petitioned in Federal lawsuit *Doe v. Prairie View A&M Univ., CIVIL ACTION NO. 4:17-CV-1957 (S.D. Tex. Apr. 25, 2018)*. Furthermore, this Federal lawsuit speaks to the Defendant's deliberate indifference and retaliation in response to Plaintiff's official complaints of claims of unlawful embezzlement and misallocation of Federal funds dispersed to H-LSAMP by the National Science Foundation and Title IV Federal funding of the Higher Education Act of 1965.

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

Plaintiff's Federal lawsuit too discloses the Defendant's gross negligence in adhering to nefarious local, State, Federal and constitutional laws promulgated thereunder by the Defendant's State and Federal funders with authoritative and jurisdictional authority over the Defendant's operations including but not limited to the City of Houston, the State of Texas, the Equal Employment Opportunity Commission (hereinafter "the EEOC), the Texas Workforce Commission, the U.S. Department of Education (hereinafter "the USDE" or "USDE"), the U.S. Department of Justice (hereinafter "the DOJ" or "DOJ"), the U.S. Department of Labor (hereinafter "DOL"), the National Science Foundation (hereinafter "NSF") and the National Aeronautics and Space Administration (hereinafter "NASA").

Plaintiff's Federal lawsuit further discloses Defendant's gross negligence including the misappropriation, misallocation and abuse of Federal funding dispersed under multifarious Federal agencies including Title IV of the Higher Education Act of 1965, Federal Grants #'s: 1911310 & 1407736 funded by the National Science Foundation and Federal Grants #'s: 80NSSC17K0405-P00001 & 80NSSC17K0405 funded by the National Aeronautics and Space Administration in which the Plaintiff was a recipient of a scholastic scholarship administered by these Federal grant alliances.

Plaintiff's disclosure of Defendant's gross negligence further includes illicit activities, criminality, malfeasance, embezzlement, and Federal fraud as set forth by 18 U.S.C §§ 1001 by virtue of Defendant's Principal Investigator and Director of Houston's Louis Stokes Alliance for Minority Participation, Dr. Bobby Wilson facilitation in the falsification of the Defendant's Certificates of Compliance with governmental agencies to receive Federal funding despite the Defendant's negligent incompliance with Federal regulatory mandates.

Plaintiff's Federal lawsuit too discloses Defendants indifferent, impermissible responses to Plaintiff's complaints which includes severely offensive, unlawful and retaliatory harassment perpetuated by Defendants Federally funded program by the National Science Foundation, Houston's Louis Stokes Alliance for Minority Participation, the Defendant's Law School, Thurgood Marshall School of Law and Department of Public Safety while acting under the color of Federal law and utilizing State and Federal resources to intimidate, exclude and dissuade Plaintiff from further participating in the formal complaint process and exposing the malpractice occurring with the operations of the Defendants Federally funded educational programs.

Defendant's sanctions, mindset, failures and negligence set forth by its administration promotes a hostile environment that limits educational, intellectual and scholastic advancement, is a disgrace to the U.S. educational system, a danger to the general public, a threat and liability to the State of Texas and Federal government and is a mockery of Federal and constitutional promulgations.

The Defendant has a longstanding history of violating Federal law, the rights and privileges of participants of their educational programs, neglecting academic programs and misallocating and embezzling Federal funds. The Defendant has made a deliberate statement that they are an entity that discriminates and will utilize any and all State and Federal resources to harass and dissuade victims from exposing the culture of Historically Black Colleges and Universities that serve as a safe haven for predators and unconstitutional doctrine.

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

# II. JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.    Plaintiff Jane Doe appears through Pro Se or Pro Se Litigant representation pursuant to 28 U.S.C. § 1654.

3.    Plaintiff sets forth claims to redress a hostile educational environment pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §1681 *et seq.,* Title II of the Americans with Disabilities Act, as amended ("ADA", "Title II" or "ADAAA"), 42 U.S.C. §12101 *et seq.*, Section 504 of the Rehabilitation Act of 1973, as amended ("the Rehabilitation Act"), 29 U.S.C. §794 and Title VI of the Civil Rights Act 1964 ("Title VI"), 42 U.S.C. 2000d *et seq.*  Plaintiff too sets forth claims pursuant to the First amendment, Fourth amendment and Fourteenth amendment of the U.S. Constitution.

4.    Plaintiff further invokes the supplemental jurisdiction of the U.S. District Court for the Southern District of Texas, pursuant to 28 U.S.C. 1367(a) to hear and decide claims arising under Texas State law as set forth in Plaintiff's Complaint against Defendants for Prima Facie Tort Case of Personal Injury, Intentional Infliction of Emotional Distress and Negligence.

5.    Venue is proper in the U.S. District Court for the Southern District of Texas pursuant to 28 U.S.C. §1391(b), as all Parties reside in this district and the events giving rise to Plaintiff's claims of unlawful discrimination, retaliation and personal injury herein were committed within the Southern District of Texas, Houston Division.

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

# III. PARTIES

**6.**    Plaintiff Jane Doe is a natural born citizen of the United States of America and at all material times resided in Harris County, Texas.

**7.**    Defendant Texas Southern University is a public postsecondary educational instrumentality of the State of Texas and general academic teaching institution pursuant to § 61.003 of the Texas Education Code and is located in Harris County, Texas.

**8.**    Defendant Texas Southern University's Board of Regents is the official governing body of Texas Southern, is composed of nine members who are appointed by the Governor and confirmed by the Senate and is charged with operating and governing the University in accordance with local, State Federal and constitutional promulgations.

**9.**    Defendant Thurgood Marshall School of Law is an American Bar Association accredited program and is under the jurisdiction of Texas Southern.

**10.**    Defendant Houston's Louis Stokes Alliance for Minority Participation is a governmental Federally funded scholastic alliance by the National Science Foundation.

**11.**    Texas Southern University received Federal funding for its academic programs and activities as contemplated by Title IX, 20 U.S.C. 1681, *et seq.*, the Clery Act, 20 U.S.C. § 1092 (a)(1)(P), Section 504, 29 U.S.C. §794 *et seq.* and Title VI, 42 U.S.C. § 2000d *et seq.*, for its activities and educational programs including Title IV Federal funding of the Higher Education Act of 1965 administered by the U.S. Department of Education and Federal grants from the National Science Foundation and the National Aeronautics and Space Administration and the U.S. Department of Justice.

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

# IV. SERVICE

**12.**     Defendant Texas Southern University may be served by service upon the Interim President of the University, Mr. Kenneth Huewitt, at the address of 3100 Cleburne Street, Office of the President, Hannah Hall, Suite 220, Houston, Texas, 77004 or wherever such person may be found.

**13.**     Defendant Texas Southern's Board of Regents may be served with process at 3100 Cleburne Street, Hannah Hall, Suite 115, Houston, Texas, 77004 or wherever such persons may be found.

**14.**     Defendant Texas Southern's Department of Public Safety may be served with process at 3443 Blodgett Avenue, General Service Building, Houston, Texas 77004 or wherever such persons may be found.

**15.**     Defendant Texas Southern's Thurgood Marshall School of Law may be served by service upon the Dean of the Law School, Dean Joan R.M. Bullock with process at 3100 Cleburne Street, Thurgood Marshall School of Law, Houston, Texas, 77004 or wherever such persons may be found.

**16.**     Defendant Houston's Louis Stokes Alliance for Minority Participation may be served by service upon H-LSAMP's Principal Investigator and Director, Dr. Bobby L. Wilson with process at 3100 Cleburne Street, Science Building, Suite 403L, Houston, Texas, 77004 and Co-Principal Investigator Donna L. Pattison with process at University of Houston, 4800 Calhoun Rd, Science Teaching Laboratory Building, Suite 108C, Houston, TX 77004 or wherever such persons may be found.

# V. FACTS

**17.**    At the time of events complained of herein, Jane Doe was a full-time transfer student attending Texas Southern University.

**18.**    Plaintiff Jane Doe petitioned in this complaint is of the same person petitioned in Federal lawsuit *Doe v. Prairie View A&M Univ., CIVIL ACTION NO. 4:17-CV-1957 (S.D. Tex. Apr. 25, 2018)* filed on Monday, June 26, 2017.

**19.**    At the time of Jane's transfer to Texas Southern in January of 2018 her subsequent Federal lawsuit *Doe v. Prairie View A&M Univ., CIVIL ACTION NO. 4:17-CV-1957 (S.D. Tex. Apr. 25, 2018)* had not been litigated nor settled.

**20.**    Jane's subsequent Federal lawsuit *Doe v. Prairie View A&M Univ., CIVIL ACTION NO. 4:17-CV-1957 (S.D. Tex. Apr. 25, 2018)* was settled for $100,000 prior to litigation by virtue of mediation on Tuesday August 7, 2018 therefore dismissing the charges against Defendant, Prairie View with prejudice on Wednesday, August 29, 2018.

**21.**    Plaintiff Jane Doe's Federal lawsuit charging Prairie View A&M University (hereinafter "Prairie View" or "PVAMU") entailed claims against Dr. Kendall T. Harris, PVAMU's former Dean of Roy G. Perry's College of Engineering, whom now serves as the Provost for Texas Southern for subjecting Jane to retaliatory acts subsequent her notifying him of her participation in her subsequent EEOC charge and Federal lawsuit.

**22.**    Simultaneous with Jane's departure from Prairie View and enrollment at Texas Southern, Dr. Kendall T. Harris, too departed from Prairie View where Plaintiff Jane Doe was a student in the Department of Computer Science for 3 years.

# A. SPRING 2018

**23.**     Jane transferred to Texas Southern University and registered for 15 credit hours in the University's College of Science, Engineering and Technology's (hereinafter "COSET") Department of Computer Science to continue pursuing her matriculation in Computer Science.

**24.**     This term Jane paid for tuition by virtue of Federal Pell Grants, and Subsidized and Unsubsidized loans dispersed from Federal funding of Title IV of the Higher Education Act of 1965 (***Public Law 89-329***) administered by the U.S. Department of Education.

**25.**     A few weeks into the semester, an international graduate student in the Department of Computer Science and COSET employee, Nurudeen Elegbede pursued Jane romantically.

**26.**     Jane declined Nurudeen's request, informed him she was in a relationship and that instead they could be friends. Nurudeen reluctantly agreed, however would still tell Jane that one day he'd get her because he's a man who gets what he wants.

**27.**     During the semester, Jane and Nurudeen would sometimes study together, exchange educational expertise, have lunch and friendly conversations. On three occasions these visits were at Nurudeen's residence per his invitational request.

**28.**     In these interactions, Nurudeen was respectful and poised yet subtly persistent and eloquent about pursuing Jane intimately. Again, Jane denied Nurudeen's request and advances and reiterated that she was in a relationship and was not willing or wanting to engage with him in such a way, except for a platonic friendship.

29.     During Spring Break, on Monday, March 12, 2018 Jane and a friend, whom too is a student in COSET decided to go out and celebrate with margaritas at Chachos Mexican Restaurant (hereinafter "the Restaurant") located at 2700 S. Loop West, Houston, TX 77054 as they had just completed rigorous midterm examinations. Throughout the day, this day, Jane and Nurudeen had been conversing via text.

30.     Before Jane's arrival to the Restaurant she had previously consumed approximately 3 Hennessey Hpnotiq mixed-drinks.

31.     At the Restaurant Jane and her friend both ordered small Caesar salads and 3 margaritas a piece, 2 large and one small. Jane was unable to finish her last margarita, the small, as she had reached her plateau, so her friend finished the margarita.

32.     When it was time for Jane and her friend to leave the Restaurant, Jane texted Nurdeen and inquired if she could stay at his house until she sobered up, which was located 5 miles from the Restaurant because she didn't believe she was able to safely operate her vehicle and drive herself home which was located 27 miles, or 30 minutes away from the Restaurant. Nurudeen agree. Jane initially wanted to spend the night at her friend's house however her friend was residing with her father whom had strict rules regarding overnight company.

33.     When Jane arrived to Nurudeen's residence, she parked her vehicle, stumbled up the stairs stumping her toe and knocked on the door. Nurdeen opened the door. And welcomed Jane in.

34.     That night while Jane was intoxicated Nurudeen raped Jane, twice.

35.     On Thursday, March 15, 2018 Jane visited TSU-PD and spoke with an officer

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

to file an official police report regarding Nurudeen subjecting her to sexual violence. When the officer began questioning Jane, she began crying hysterically due to humiliation and fear and informed the investigating Officer that she wanted to go home. Thereafter, Jane left the police station in tears.

36.    The following day, Friday, March 16, 2018 Jane returned to TSU-PD and made an official report of the rape and sexual violence Nurudeen subjected Jane to.

37.    On Tuesday, March 20, 2018 TSU-PD forwarded Jane's complaint to TSU's now former, Office of Human Resources Associate Vice President/CHRO and Title IX Coordinator, Ms. Keisha David.

38.    Jane too reported the rape and sexual violence to Houston's Police Department who presented the charges to the Harris County District Attorney's Office ("hereinafter DAO") however the DOA denied the charges against Nurudeen.

39.    On Wednesday, March 28, 2018 Jane had her first interview regarding her Title IX complaint with Texas Southern's now former Deputy Title IX Coordinator, Ms. Ja'Wana Green.

40.    Ms. Green's demeanor and investigatory practices were hostile, indifferent and biased toward the accused, Nurudeen.

41.    On Thursday, April 5, 2018 while Jane was on her way to class, she saw Nurudeen in the Technology Building.

42.    As aforementioned, Jane and Nurudeen were both students in COSET and therefore attended classes in the same building, on the same floor and at the same time.

43.    Jane was scared, hyperventilating and anxious at the sighting of Nurudeen and

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

at the advisement of TSU-PD during the filing of her initial report, contacted TSU-PD and requested an officer to the scene.

44.     An hour later TSU-PD Officer, Stacey St. Romain arrived at the Technology Building bothered, annoyed and unconcerned regarding Janes concerns of her personal safety and being within close proximity to her assaulter.

45.     Jane informed Officer St. Romain that she saw the Respondent Nurudeen, was scared and felt unsafe. He responded and said, "Well, what do you want me to do about it?" while shrugging his shoulders with a look of disinterest.

46.     For the remainder of the semester Jane had to attend classes just steps away from her assaulter.

47.     Jane contemplated withdrawing from school however due to her already prolonged postsecondary education journey in dealing the financial and emotional effects of her subsequent civil action she persevered and finished the semester.

48.     As aforementioned, at this time Janes subsequent Federal lawsuit had not been litigated or mediated.

49.     When the Spring 2018 semester term concluded Jane achieved a 3.5 GPA, earning all A's with the exception of one course that she was issued an "I" or "Incomplete" in to permit her additional time to satisfy the course requirements as a result of the emotional and psychological effects of the rape and sexual violence.

50.     On Monday, May 7, 2018 Jane had a follow-up meeting with Ms. Green regarding Jane's Title IX complaint. In this meeting Ms. Green emphasized and insisted on referring to the events that occurred the night of the offense as "sex". All statements Ms.

Green reiterated were immeasurably prejudice toward the Respondent, Nurudeen.

**51.** During the course of Ms. Green's Title IX investigation, Jane identified countless policy inaccuracies as well as improper investigatory practices that were incompliant with the promulgations of the Title IX Federal civil right statute, its implementing regulation, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092 (P) (***Public Law 101–542***) and its amendment, the Violence Against Women Act, as amended (***Public Law 103–322***).

**52.** In that, on Wednesday June 20, 2018 Jane filed a second Title IX complaint addressed to Ms. Kiesha David, Ms. Ja'Wana Green and Texas Southern's now former President, Dr. Austin A. Lane disclosing the University's Federal incompliance and improper investigatory practices with regard to Title IX.

**53.** Subsequent Janes submission of the aforementioned 2nd Title IX complaint, Ja'Wana Green and Kiesha David, were fired as the University Title IX Coordinators.

**54.** On Wednesday, July 18, 2018 Texas Southern issued Jane a memorandum entailing their investigative findings of her initial Title IX complaint of rape, though they did not respond to Janes second Title IX complaint of Texas Southern's incompliance with the Title IX Federal civil right statute by virtue of the tainted investigation.

**55.** In Nurudeen's admittance to raping Jane, he was found responsible for violating Texas Southern's Title IX Policy and was reprimanded to 1 ½ years of suspension from the University, mandated Title IX training upon returning to the University and a precaution that Nurudeen was restricted from residing in University housing for the remainder of his matriculation at Texas Southern.

# B. FALL 2018

**56.** When the Fall 2018 term began, Jane was undergoing Cognitive Behavioral Therapy to address the emotional and psychological effects of Post-Traumatic Stress Disorder (hereinafter "PTSD") as a result of being sexually assaulted and subjected to sexual violence the subsequent semester.

**57.** This term Jane was determined ineligible for financial aid as she had met her aggregate loan limits set forth by the U.S. Department of Education and therefore was responsible for finding alternative funding for her education.

**58.** In that, and at the recommendation of Dr. Oscar O. Criner, COSET's Interim Dean, Jane visited Houston's Louis Stokes Alliance for Minority Participation Program Coordinator, Ms. Michelle Y. Tolbert and applied for acceptance into the governmental scholastic alliance funded by the National Science Foundation.

**59.** The National Science Foundation is an independent U.S governmental agency created by Congress in the 1950's "*to promote the progress of science, to advance the national health, prosperity, and welfare and to secure the national defense...*".

**60.** The Louis Stokes Alliance for Minority Participation program theory is based on the Tinto model for student retention. The overall goal of the program is to assist universities and colleges in diversifying the nation's Science, Technology, Engineering and Mathematician (hereinafter "STEM") workforce by increasing the number of STEM baccalaureate and graduate degrees awarded to populations historically underrepresented in African American, Hispanic American, American Indian, Alaska Native, Native Hawaiian, and Native Pacific Islander disciplines.

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

**61.**     H-LSAMP is Houston's consortium of LSAMP programs and is comprised of six area colleges including Texas Southern University, University of Houston, Texas State University, Rice University, University of Houston-Downtown and University of Houston-Clear Lake, two area community colleges, Houston Community College and the San Jacinto College District and Houston Independent School District.

**62.**     For admission into the LSAMP scholastic alliance, Jane had to obtain three letters of recommendation. In that Jane requested recommendations from three COSET faculty members, two of Janes professors' that issued Jane A's in their courses, Dr. Oscar O. Criner and Dr. Aladdin M. Sleem and Janes academic advisor, Dr. Lila Ghemri.

**63.**     Of the three faculty members, Dr. Criner was the only person to grant Janes request and recommend her for the scholarship to continue her postsecondary education.

**64.**     Dr. Sleem ignored Janes request all in all and in addition to discouraging Jane from continuing to pursuing her matriculation in the Computer Science discipline during advisement, Dr. Ghemri informed Jane she does not recommend students for scholarships though she had provided recommendations for scholastic and employment opportunities for several students of the same nationality and ethnicity as her.

**65.**     Dr. Criner is a natural born U.S citizen and Dr. Ghemri and Dr. Sleem are foreign born citizens of Middle Eastern descent. Jane believed their denials were on the basis of Janes race, color and national origin as when Jane began her studies at Texas Southern many natural born U.S. citizen participants shared with Jane COSET's foreign administrators' inconspicuous disinterest in the advancement of Americans in STEM.

**66.**     All of COSET's departments are predominately overseen if not fully operated

by foreign born administrators and professors.

**67.** Jane has personally witnessed these instructors make it a priority in their instruction, advisement and issuance of scholastic opportunities to exclude and dissuade American's from participating in COSET's educational programs.

**68.** Jane personally experienced this on numerous occasions prior to her recommendation requests as Jane witnessed these privileged international students in COSET miss the majority if not the entire semester while still receiving academic credit for the course despite their nonattendance.

**69.** These privileged internationals are too issued relatively higher grades than American students despite their understanding of coursework and intellectual abilities being less than others.

**70.** These students also receive priority consideration for institutional scholarships, employment and internship opportunities and overall, statistically their graduation rate continues to increase as American's representation in STEM disciplines catastrophically decreases as a result of foreign professors' allegiance to their perspective ethnicities.

**71.** Despite their denials, Dr. Criner's letter or recommendation was sufficient to qualify Jane for consideration for acceptance into the LSAMP scholastic alliance.

**72.** On Tuesday, September 11, 2018 Jane was accepted into H-LSAMP and was awarded a $14,000 scholarship to defray her educational expenses.

**73.** One of the many stipulations to remain eligible for membership in the alliance was for students contribute 15 hours weekly toward collaborative learning that had to be completed in the Collaborative Learning Laboratory (hereinafter "the Laboratory" or "Lab")

located in COSET's Science Building, Suite 103.

**74.** When Jane began her collaborative learning hours she began struggling with her academics and her emotional health worsen as a result of the hostile environment perpetuated by the LSAMP Scholars, Program Coordinator and Directors.

**75.** LSAMP's Program Coordinator, Ms. Tolbert, whom was responsible for overseeing the operations of Laboratory and academic success of Scholars, abandoned all responsibilities to take a sabbatical and left the Lab in the hands of the Scholars.

**76.** In Ms. Tolbert's absence the Laboratory's environment was hostile as the Lab became a playground for socialization, the orchestration of cheating scandals and a meet-up place for Scholars to engage in side bar discussions regarding campus gossip, personal relationship problems, sexually inappropriate dialogue and sometimes sexually inappropriate activities.

**77.** This distorted the aura of the intended purpose of the Collaborative Learning Laboratory and was in complete opposition of the National Science Foundation's mission and goals for the orchestration of LSAMP programs.

**78.** Other LSAMP Scholars were too struggling academically and as a result some Scholars, such as Asia Bryant engaged in quid pro quo with professors to secure passing grades to maintain their status in the alliance and have priority access to educational opportunities such as internships, academic provisions, employment opportunities and overall institutional advancement.

**79.** Asia and Jane were both enrolled in Dr. Roderick Holmes, MATH 250 Linear Algebra course in the Fall 2018 as well as several other LSAMP Scholars.

80.     Dr. Holmes, in addition to serving the University as the Department Chair for the Department of Mathematics and Associate Professor, is a tutor and mentor to the Scholars in the LSAMP program.

81.     Asia Bryant and Dr. Holmes had an intimate relationship that abruptly ended prompting Asia to petition an anonymous complaint in COSET's Town Hall meeting on Wednesday, November 28, 2018 disclosing alleged unprofessionalism by Dr. Holmes as well as his accomplice, Dr. Willie Taylor, H-LSAMP's Associate Director.

82.     Subsequent this relational separation and publication of Dr. Holmes indiscretions, Asia who would normally cater to and overtly offer assistance to Dr. Holmes during instructional class time, did not attend class for several days if not weeks. In her absence, while negating his obligation to cover course material Dr. Holmes utilized the entire class times to discuss how bitter woman blackmail married men when men ultimately decide to stay with their wives and leave the side chick.

83.     Dr. Holmes would also share his hatred and disliking for Caucasians, or "white folk" as he would call them. He'd allocate at least 30 of the 50 minutes of class to justify his disliking for Caucasians persons ranging from a variety of unconstitutional theoretical reasoning correlating these experiences to his involvement with University of Houston personnel.

84.     In addition to the racial discriminatory environment perpetuated by LSAMP overseers, the Laboratory too lacked basic educational necessities for academic success such as functioning computers, operational printers, printing paper, dry erase markers, tissues, paper towels and educational literature.

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

85.     In Ms. Tolbert's absence, Jane made an effort to keep the Lab operational by personally purchasing things for the Scholars such as tissues, printing paper, hand sanitizers and dry erase markers out of her own money.

86.     The Scholars were thankful for these contributions and thanked Jane.

87.     Contributing 15 hours weekly to this mismanaged Laboratory in addition 15 credit hours became burdensome, as Jane was still left with the responsibility finding additional time to do studying that couldn't be done in the Lab due to the hostile environment and her deteriorating mental health as a result of.

88.     Jane tried sharing these pertinent concerns with Ms. Tolbert during her rare appearances in the Lab, however Ms. Tolbert just informed Jane that she needed to try harder and while hastily gathering her things for her next planned vacation.

89.     Midway through the Fall term, on Thursday, October 4, 2018 while Jane was on her way to school, she witnessed a man committed suicide by jumping from the Pinemont Bridge on to the Northwest Freeway (290 West).

90.     The deceased was strike by an 18-wheeler that dismembered his body scattering his remains across the freeway, leaving remnants of the deceased's blood on Janes, and other vehicles.

91.     Still in shock, Jane still attended class that day. Witnessing this tragedy left Jane traumatized, despondent and exacerbated her phycological symptoms of PTSD.

92.     Furthermore, this resonated with Janes as her father too committed suicide publicly when she was an infant and witnessing this event, in addition to enduring repeated sexual violence flared traumatic flashbacks and feelings and emotions of suicidal ideation

in addition to her PTSD.

**93.**    Three weeks later, on Sunday, October 28, 2018 Janes grandmother unexpectedly passed away. Janes grandmother played a significant role in her life as she assumed that parental role in Janes life after her father's unfortunate passing.

**94.**    This left Jane distraught, clinically depressed and emotionally and mentally unable to prosper academically considering the already hostile environment perpetuated in LSAMP Laboratory and the overall unconstitutional operations University.

**95.**    In an effort to address these phycological symptoms on Monday, November 9, 2018 Jane visited Texas Southern's Counseling Center however due to limited staff and University recourses allocated for counseling services the one counselor available to serve the entire congregation of "10,000" students was only able to schedule an appointment for Jane once for the semester.

**96.**    Moreover, Janes counselor was not able to schedule a follow up with Jane until the Spring 2019 term, 8 weeks later.

**97.**    The semester was near to concluding and Jane desired to share these concerns with Ms. Tolbert however Jane dreaded doing so for many reasons.

**98.**    Ms. Tolbert would often say things like, "I'm gone take ya scholarship!" or "You know what yall don't wanna act right I'm just gone take ya scholarship" in an abusive threatening tone when the LSAMP scholars wouldn't do something as Ms. Tolbert requested of them or how she requested of them, like apply for internships.

**99.**    She reiterated those threatening statements, at least 3 times within a 3-hour span of her rare presence in the Laboratory. On a specific occasion Jane heard Ms. Tolbert speak

of a male LSAMP student who was struggling academically and say, "I'm gone get 'em on up outta here" in a low mumbled tone while talking through her teeth.

**100.** In this, Jane knew there stood a great risk of Ms. Tolbert apprehending her scholarship stipend due to her disabling condition.

**101.** Jane was emotionally and mentally distraught. Jane knew that despite her perseverance because of the already persuasive hostile environment and her deteriorating mental health as a result of, she could not perform at her full potential and exemplify through her coursework and exams that she thoroughly understood the course material instructed.

**102.** In that Jane requested an "I" or "Incomplete" in four of her five courses on Saturday, December 8, 2018 due to the academic inferences of witnessing and experiencing traumatic events occurring beyond her control.

**103.** An "I" or "Incomplete" is an institutional academic provision provided to students when a student has completed and passed a majority of the work required for a course but, for reasons beyond the student's control, cannot complete the entire course.

**104.** Janes requests was sent via e-mail to three professors, Dr. Khaled Kamel, Dr. Pratap Talusani and Dr. Sharlette Gilbert.

**105.** In Janes e-mail she informed the recipient professors of her mental health diagnosis and disability, the traumatic events that occurred that term being the public suicide Jane witnessed, losing her grandmother and her exacerbated symptoms considering her father's too unfortunate suicide passing.

**106.** Jane made an in-person request to Dr. Roderick Holmes.

**107.** Two professors' granted Janes requests for Incompletes however two

professors. Dr. Khaled Kamel and Dr. Sharlette Gilbert denied Janes request and thereafter issued Jane failing grades despite her eligibility for this academic provision.

**108.**  Dr. Pratap Talusani responded to Janes request with compassion and care. His e-mail response to Jane stated "I understand your situation. I have already turned in a grade C for you. I can still change it to an I, but I need to know before 11PM tonight. Let me know for sure. Regards, Professor Talusani".

**109.**  Dr. Roderick Holmes granted Janes request as well, though verbally.

**110.**  Dr. Khaled Kamel ignored Janes request all in all.

**111.**  Subsequent three e-mail attempts, Dr. Sharlette Gilbert responded to Janes request with "Thank you for your message. I do not give "I"/Incompletes. I have submitted the grades to the Registrar's Office…and they are final. Thank you. Sincerely, Dr. Sharlette A. Kellum-Gilbert."

**112.**  The prior term in the Spring of 2018 Jane was issued an Incomplete when her cause was due to her Title IX case and she believe her denials this Fall 2018 term were on the basis of her disability and protected classes.

**113.**  In this, on Thursday, December 20, 2018 Jane visited Ms. Toni Gray, TSU's newly documented "Title IX Coordinator" to inquire of the official process to attest a Title II/Section 504 disability discrimination complaint in an effort to attest the denials. In this encounter Ms. Gray was unbiased, polite and provided Jane with the University's Title II/Section 504 Policy that expired on September 1, 2016 under the leadership of Texas Southern's prior President before President Austin Lane, President John Rudley.

# C. SPRING 2019

**114.** Over the winter break Jane visited the University of Houston's Trauma and Anxiety Clinic of Houston (hereinafter "TRACH") where she received immeasurable support, resources and began a personalized treatment plan to address her mental health.

**115.** A stipulation to remain eligible for membership and financial assistance in the LSAMP scholastic alliance was for Scholars to maintain an overall GPA of 2.5.

**116.** Jane failed to meet these requirements as a result of her discriminatory Incomplete denials the subsequent semester, placing Jane in a Probationary status.

**117.** Before the semester resumed, on Tuesday, January 15, 2019 around 7:00AM Jane went to the Collaborative Learning Laboratory to notify the LSAMP committee of her disability and unsatisfactory academic performance as a result of.

**118.** At this time, Jane was the only person in the Lab until Ms. Tolbert arrived around 10:30 AM. When Ms. Tolbert arrived her demeanor towards Jane was strange, in comparison to their prior encounters. Though Ms. Tolbert was never entirely professional she was at minimum cordial with Jane however at this moment Ms. Tolbert made a clear statement that she was disinterested and has a personal disliking to Jane.

**119.** When Jane saw Ms. Tolbert, Jane spoke and said "Hey Ms. Tolbert" excited to see her and with hopes to discuss Janes future in the alliance however Ms. Tolbert just blankly starred at Jane, rolled her eyes, shook her head, went into her office, closed the door and began making personal calls.

**120.** On Friday, January 18, 2019 at 10:25 AM Jane visited Ms. Charlette Whaley,

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

COSET's College Business Administrator III to inquire of the process of petitioning a complaint against employees in COSET due to Ms. Tolbert's unexplainable indifferent treatment towards Jane and COSET professor, Dr. Khaled Kamel's discriminatory denial of Janes incomplete request.

**121.** In this visit, Ms. Whaley provided Jane with a complaint form via Janes University email and the proper channels to report such incidents.

**122.** On Friday, January 25, 2019 Jane had an advising session with Dr. Lila Ghemri, COSET's Interim Chair for the Department of Computer Science and Academic Advisor.

**123.** Dr. Ghemri's demeanor and interactions with the student before Jane, who was of the same ethnicity as Dr. Ghemri was professional, informative and supportive.

**124.** In Janes advising session, Dr. Ghemri was rude and too expressed a sincere disinterest in assisting, helping and interacting with Jane. While Jane was attempting to register for advanced courses Dr. Ghemri euphemistically recommended that Jane discontinue her educational studies in COSET and in the Computer Science discipline.

**125.** Despite Dr. Ghemri's prejudice and objectionable advisement Jane registered for 15 credit hours for the Spring 2019 academic term.

**126.** On Wednesday, January 30, 2019, a week into the semester while in the LSAMP Lab, Jane made a second attempt to connect with Ms. Tolbert. Ms. Tolbert's demeanor remained unpleasant and unwelcoming specifically to Jane considering Ms. Tolbert had a friendly grandmotherly tone with the other Scholars.

**127.** Jane inquired whether Ms. Tolbert received her e-mail regarding her standing in the LSAMP program. Ms. Tolbert confirmed that the LSAMP committee received it

though none of the parties felt it was worth a response.

**128.** In this conversation, Ms. Tolbert treated Jane with miniscule respect. The entire time Jane spoke to Ms. Tolbert she was playing a game on her android and as Jane attempted to speak with her about pertinent matters that required the program coordinators attention, she continued punching the bubbles on her phone with her index finger with her lips twisted to the side.

**129.** Ms. Tolbert's speech was slurred and staggered due to her being so engrossed in her game. She did however inform Jane that she would provide her with a letter regarding her standing in the alliance but not at that exact moment and dismissed Jane with malice.

**130.** A few days later, Jane followed up regarding this matter. This time Ms. Tolbert's disposition was surprisingly more demeaning and insulting than Janes previous encounters.

**131.** Upon entering the LSAMP Laboratory Ms. Tolbert spoke to all of the students, individually, by name, except Jane. A few moments after Ms. Tolbert settled in her office, Jane knocked on her door. Ms. Tolbert looked at Jane but did not say anything. Jane greeted her then asked Ms. Tolbert if she could provide Jane the letter regarding her membership standing as an LSAMP Scholar and scholarship recipient.

**132.** Ms. Tolbert did not respond to Jane though she began to shuffle through stacks of papers dropping some on the floor in addition to a metal spoon. She was fidgety. When she found the letter, she was to provide to Jane she held it up at Jane, while still looking down at the floor.

**133.** Jane took it from her hands and said, "Thank you.", again Ms. Tolbert ignored

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

Jane. During this encounter with Ms. Tolbert she did not utter a word or acknowledge Jane's presence.

**134.** Other LSAMP Scholars, some being classmates of Janes were in the Laboratory when this conversation was had.

**135.** Ms. Tolbert's treatment towards Jane was so disdainful and pronounced that Janes peers recognized the difference in her treatment towards Jane and inquired why. Jane too was astounded by this unwarranted treatment therefore making a rebuttal illusory.

**136.** Following this encounter with Ms. Tolbert many LSAMP Scholars, some whom Jane had classes with began to monitor and micromanage Jane. Some of their monitoring mechanism would entail monitoring Janes whereabouts and following Jane when their classes together would conclude. The Scholars would also follow Jane to her vehicle when she'd leave the LSAMP Laboratory.

**137.** There was also a heighten presence of police in the LSAMP Laboratory, simultaneous with Ms. Tolbert's unlawful discriminatory and retaliatory harrassment.

**138.** On Monday, February 4, 2019 around 8:00 PM Jane was sitting in the Collaborative Learning Laboratory studying and janitor Elaine R. propped the key card access entry door open with a wet floor sign and left.

**139.** Moments following a TSU Police Officer entered the Lab, closed the door and sat at a computer near the rear east corner. He sat in the Lab and observed Jane for approximately 2 hours before leaving. Jane and the Police Officer were the only persons in the lab during this time.

**140.** Periodically, Jane would turn around to see what the Officers cause of action

was however he was just blankly staring at Jane.

**141.**    Jane was petrified and as a result left Lab.

**142.**    The next day, Tuesday, February 5, 2019 at 1:30 PM Jane had left the LSAMP

Lab (located in the Science Building) to go her classes (located in the Technology Building).

**143.**    While on her way Jane decided to sit at a bench in the passageway between the

two buildings to get some fresh air. As Jane sat there, a TSU Security Officer came rolling

by on a utility truck while evidently observing Jane. The Security Officer drove in a repeated

circular motion in the driveway until Jane got up and entered the Technology Building to

attend class.

**144.**    Later that day at 4:04 PM, after Jane finished her classes in the Technology

Building, she began walking toward the Science Building to revisit the LSAMP Lab to study.

As Jane walked out of the door a TSU-PD Officer was sitting in the passage way again

observing Jane.

**145.**    The following day was Ms. Tolbert's mandatory LSAMP meeting. Initially

Jane was not was not planning on attending due to a prearranged counseling appointment

however Jane was able to reschedule and attend the meeting.

**146.**    On Wednesday, February 6, 2019 at 4:56pm Jane walked in the Lab to attend

the meeting. As she entered the room, Jane overheard an LSAMP Scholar say "Omg she

came and tha meeting bout' her" while attempting to whisper to her friend.

**147.**    As Jane continued to walk toward where she'd normally sit, she passed Ms.

Tolbert who repeatedly uttered derogatory vulgarities at Jane. Asia Bryant, a student whom

is relatively close with Ms. Tolbert too reiterating similar derogatory slurs as Jane passed

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

the two of them to find a seat for the meeting.

**148.**   When the meeting began Jane sat at the front table. As Jane sat Ms. Tolbert and Dr. Willie Taylor scowled at Jane with utter disgust. Jane was attempting to show Ms. Tolbert she was taking her participation in the alliance seriously by giving her my undivided attention not to be the objective of retaliatory harassment.

**149.**   More importantly Jane couldn't understand what she had done to be referenced to with such sexually defamatory vulgarities. Ms. Tolbert and Asia's behavior was very familiar to Jane as she experienced the same treatment when the claims of her subsequent Title Federal lawsuit were publicized at her former University, PVAMU.

**150.**   Asia Bryant also jokingly mimicked sexually explicit gestures of the act of engaging in sexual intercourse while snickering and laughing.

**151.**   Ms. Tolbert began the meeting in a dry, bothered mumbling tone. She stood directly in front of Jane and said "Things happen, life happens but we have to bounce back…okayyyyyy" while popping her lips concluding the statement.

**152.**   She too discussed that there were students in LSAMP who hadn't performed well academically and made an implication saying they knew who they were while gazing right at Jane catching the attention of the other Scholars.

**153.**   When the meeting was over, Jane went over to where Ms. Tolbert was distributing organizational T-Shirts to receive the shirts she'd paid for. Ms. Tolbert skipped over Jane and began to assist another LSAMP scholar named Sara. Feeling unwanted, humiliated and devastated Jane proceeded to leave the Lab.

**154.**   As Jane was near to the door, Jane saw Alicia Fontenot a veteran in the LSAMP

program. Alicia inquired about Janes hair and the technique Janes stylist used in achieving the style.

**155.** In mid conversation, Asia Bryant squeezed in between them, with her back-facing Jane, bumping Jane in the process and began a conversation with Alicia. "Hey pretty girl" she said to Alicia, while glancing at Jane with a smirk.

**156.** Thereafter Jane concluded her conversation with Alicia following Asia's interruption and exited the Lab in tears.

**157.** At this moment, Jane knew that somehow, someway Ms. Tolbert and her peers were aware of her sequent Title IX Federal suit and what she was experiencing was retaliation for her subsequent engagement and participation in protected activity.

**158.** In this, and in addition to preparing official grievances regarding her discriminatory incomplete denials, Jane began preparing a formal complaint regarding the illicit activities she witnessed occurring within H-LSAMP.

**159.** The following day, Thursday, February 7, 2019 Jane was in the LSAMP Lab studying. Only two Scholars were in the Lab at this time. A male Scholar and Jane.

**160.** Ms. Tolbert came in and inquired whether anyone had seen her "little nephew" though he was an adult. The male student responded that he had not seen him, and Ms. Tolbert began walking back towards the door.

**161.** Before she exited the Lab, Jane said, "Hey Ms. Tolbert" in hopes of her disposition toward Jane being accidentally but before Jane could finish her statement, in mid-sentence Ms. Tolbert over talked Jane saying "Hey yall, uh huh, how yall doing?" in a stale tone though she had already spoken to the male student.

**162.** This was the fifth distinctive encounter Jane had with Ms. Tolbert that contributed to Janes exclusion from participation in the University's Federally funded LSAMP program and was utterly humiliating and discouraging for Jane.

**163.** About 30 minutes later Ms. Tolbert returned, this time with her "little nephew". Shortly after, Jane left the Lab to escape the uncomfortableness that evokes being around someone who has discriminated against you, leaving her MacBook Pro and backpack on the table where she was seated.

**164.** When Jane returned her things were in a disarray and scattered in comparison to the manner in which she'd left them. In particular, Janes MacBook was dispositioned, and tabs Jane had closed were open, one being a notice of discrimination regarding Ms. Tolbert's discriminatory and retaliatory treatment and a report of misallocation of Federal grant funds expended to H-LSAMP from NSF.

**165.** The only individuals in the Lab during this short interval of Janes absence was Ms. Tolbert, her "little nephew" and a male LSAMP Scholar.

**166.** Following Ms. Tolbert searching Janes MacBook and viewing Jane complaint correspondence entailing her discriminative and retaliative behavior towards Jane, her disposition changed instantly. Ms. Tolbert's demeanor was still disrespectful yet somewhat subtle.

**167.** About 20 minutes after Jane returned to the Lab Ms. Tolbert stopped to ask Jane if she'd gotten her classes together, told Jane that she was a good student and that she'd do well that semester in a trembling tone.

**168.** Thereafter she walked off and mumbled "Got that over with."

**169.**   It was awkward, and Jane was hesitant in responding as a result of. Just weeks, days and literally moments prior Ms. Tolbert's behavior toward Jane consisted of ignoring her in regard to organizational and academic matters, over talking Jane, dis-acknowledging her presence and spewing derogatory slurs at Jane. Now, Ms. Tolbert was extending herself to address private concerns Jane presented to her weeks prior.

**170.**   Shortly after, Jane left the Lab due to Ms. Tolbert's behavior distorting the aura conducive to educational, intellectual and scholastic advancement that instead perpetuated a hostilely persuasive atmosphere.

**171.**   In addition to enduring the multifarious forms of discrimination within H-LSAMP and COSET, Jane too was experiencing extensive harassment from Texas Southern's Department of Public Safety officers and security officers on a daily basis.

**172.**   Ms. Tolbert orchestrated a thanksgiving canned food drive the prior semester, and thus required all students to donate specified named brand canned goods for donations. Jane, one of four Scholars who donated, donated four of each item requested during September of 2018 however 3 months later they had yet to be donated.

**173.**   As some of Janes perishable donations were due to expire Jane inquired to Ms. Tolbert whether the LSAMP alliance would still be able to give back to the community with the donations. Ms. Tolbert did not provided Jane with a response.

**174.**   On Wednesday, February 13, 2019 at 7:38 PM Jane retrieved her canned goods from Lab to donate them to the Houston Area Woman's Center, a local organization that assist and support victims of domestic abuse and sexual assault.

**175.**   Two days later, on Friday, February 15, 2019 at 12:30 PM Jane filed two

official University grievances via e-mail to three University personnel regarding Dr. Sharlette Kellum-Gilbert and Dr. Khaled Kamel's discriminative denials of Janes Incomplete request on the basis of her disability and other protected classes.

**176.** Hours later at 5:08 PM Jane received an email from Ms. Tolbert informing Jane of a mandatory community service event scheduled for the following morning Saturday, February 16, 2019 at S.H.A.P.E Community Center at 8:00 AM.

**177.** Ms. Tolbert's email was sporadic and offered no heads up, so Jane inquired to another LSAMP Scholar, Alicia Fontenot if she'd also been informed of this event considering it was not discussed at the mandatory meeting Ms. Tolbert scheduled just days prior.

**178.** Alicia informed Jane that she'd heard of it but denied having details regarding the event.

**179.** Jane arrived at Texas Southern for the community service event at 8:11 AM. Upon Jane's arrival she notified Alicia via text of her presence. Alicia responded and informed Jane that she wouldn't be penalized for not wearing a TSU or LSAMP shirt though the email failed to establish such requirement.

**180.** Thereafter, the Scholars carpooled, Jane rode alone, and all attendees met at Shape Community Center located at 3815 Live Oak St, Houston, TX 77004.

**181.** With such short notice of this event Jane did not have ample time to prepare herself mentally to be in this hostile environment, so she sat in my car for a few moments to recuperate and manage her anxiety. Jane was the last person to enter the center.

**182.** When Jane entered the center, the majority of Janes peers whispered

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

instinctively, mainly females, while fixating their attention on Jane. Some even pointed and made facial gestures while doing so.

**183.** Every other Scholar had on an LSAMP shirt issued by Ms. Tolbert except Jane.

**184.** Since Jane was not in appropriate attire she sat to the side, two seats away from Ms. Tolbert. Jane felt out of place and single out.

**185.** To start off the community service, one of the representatives at the center provided a summary of the center's history and their commitment to the community.

**186.** Shortly after, he concluded his presentation to assist with the homegoing service of one of the community elders. He informed the Scholars that since their visit was unplanned and the center was facilitating the homegoing service they did not have any volunteer work for the Scholars to participate in.

**187.** After a few minutes of sitting and waiting for further instruction, Jane asked Ms. Tolbert why she wasn't notified to wear a specified shirt for the event and why she wasn't issued her shirts though she had paid for them ($42.00) in full on October 22, 2018 and Scholars who had not paid for them received them in spite of.

**188.** Ms. Tolbert responded by informing Jane she had been extremely busy in the previous weeks due to assuring the NSF funded H-LSAMP **Grant #:** 1911310 would be funded for the following semester.

**189.** Ms. Tolbert too shared with Jane that she believed the size Jane ordered would not fit her because Jane was too big, though the shirts were an adequate size.

**190.** These body shaming humiliating insulting statements lasted about 3 to 4 minutes and Ms. Tolbert made them boastfully in the presence of Janes peers.

191.   Some of the Scholars laughed at Jane as they found Ms. Tolbert's insults and sarcasm amusing.

192.   Following Ms. Tolbert's, sizism discriminatory conduct she began to voluntarily share with Jane her disposition with her personal family issues.

193.   All Jane did was inquire why she hadn't received her shirt and in return Ms. Tolbert shared with Jane that her brother had passed away and her mother was very ill, while shedding a tear.

194.   Jane responded by informing Ms. Tolbert that was understandable however she did not grasp Ms. Tolbert's inferred correlation with the reasons provided and her explanation as to why she hadn't been issued a shirt considering Ms. Tolbert's financial compensation administered by NSF Federal funds dispersed to H-LSAMP was contingent upon her performing as the Program Coordinator and it was her duty.

195.   Moments later Ms. Tolbert began a conversation with another LSAMP Scholar. Ms. Tolbert inquired how her classes were, what new events/programs she was participating in and showed genuine concern and interest in conversing with her.

196.   Ms. Tolbert's demeanor and interactions with this student and other students were contrary to her treatment towards Jane and was a deliberate statement that the way she was treating Jane was intentional.

197.   This further influenced a hostile environment, so Jane got up to view the photos on the walls of the outreach community center. While viewing the photos Jane saw an instrument in one of the photos on the wall, she'd once played so she inquired to one of the gentlemen host if the center had one.

**198.** He brought the presenter to Jane, who informed Jane that the center had a band that played the drum but concluded their lessons when the instructor passed away.

**199.** In the middle of their conversation, Ms. Tolbert, who was sitting next them, interrupted Jane to ask the man if he had anything for the Scholars to do. In response, he re-informed Ms. Tolbert that the center had nothing for the Scholars to do because of the funeral service they were preparing for and that the Scholars could just look around.

**120.** In their conversation, Ms. Tolbert mentioned the food co-op program the scholars were supposed to participate in with their Thanksgiving Drive.

**201.** She informed the man that the reason she had not brought donations, as she did in the past 18 years, was because her brother passed away the prior year, her mother was very ill and as a result she did not have time to bring them, though the center was .6 miles away from the University.

**202.** Ms. Tolbert reiterated those statements to the man several times, while glancing over at Jane. He apologized for her lost and in return informed her that the community center hadn't done a food co-op in the past year or so and concluded their conversation.

**203.** About 5 minutes later, the man who Jane spoke with about the drum returned and asked Jane if she liked music. Jane said yes and the two began conversing.

**204.** As Jane and the man were conversing Ms. Tolbert, who was sitting two seats away from the two got up, walked across the room and attempted to lift a large portrait off the wall then began yelling and becking for his help.

**205.** The man who was speaking to Jane stop and ran to assist her.

**206.** While looking at the portrait in addition to the historic artifacts on the wall Jane

**Page 35 of 84**

saw something that caught her eye, so she inquired to the man of its origin.

**207.** In the midst of this conversation, Ms. Tolbert interrupted Jane again, and informed the man to inform the Scholars to come and view the portrait of the elder of the center who passed away.

**208.** From this point on it was obvious Ms. Tolbert didn't want Jane to participate in this event, so Jane returned back to where she was sitting and began reading the pamphlet the center gave the Scholars.

**209.** When the event was near to ending Alicia approached Jane. The two began conversing about hair care and hair products as they normally would, and Ms. Tolbert interrupted this conversation again requesting for Alicia to bring her clipboard.

**210.** Thereafter, Ms. Tolbert concluded this volunteer event that lasted an hour.

**211.** After returning to the school Jane went to Ms. Tolbert's office to retrieve her shirts. Other LSAMP Scholars were present during this conversation. Again, in this exchange Ms. Tolbert continued to reiterate how she couldn't fathom that Jane could fit the shirt because Jane was much larger than that size she ordered.

**212.** In the midst of this exchange a male LSAMP Scholar came and returned a borrowed shirt to Ms. Tolbert.

**213.** Finally, after several moments of her public insults she gave Jane her shirts.

**214.** While Jane was on the way to her car, she saw the male who gave the shirt to Ms. Tolbert. She inquired how he was he able to get a shirt for the event, he responded and informed Jane that Ms. Tolbert gave him one to borrow because she wanted everyone in unison.

**215.**   Jane believed Ms. Tolbert refusing to provide her with her shirts was for two reasons, by virtue of her actions and treatment towards Jane, Ms. Tolbert felt Jane was not worthy to be a Louis Stokes Alliance for Minority Participation Scholar because of her subsequent participation and claims petitioned in her subsequent Federal lawsuit and on the basis of her disclosed disability.

**216.**   Subsequent the volunteerism event, TSU-PD's harassment of Jane worsened and occurred daily mainly while Jane was in transit to and from the LSAMP Lab.

**217.**   Some of these events occurred on February 20th, 21st, 23rd and the 25th.

**218.**   This vigilante harassment exacerbated Janes PTSD symptoms making learning or any type of scholastic advancement impossible in the unconstitutional environment of the University perpetuated by administrators through its services and operations.

**219.**   In that, on Thursday, February 21, 2019 Jane visited Texas Southern's Office of Human Resources to inquire of Texas Southern's policies and procedures for investigating Federal civil rights violations, particularly pertaining to Title IX of the Education Amendments of 1972.

**220.**   The receptionist referred Jane to speak with Ms. Toni Gray, TSU's Sr. Employee Relations Specialist.

**221.**   In summary, Jane informed Ms. Gray that she had been subjected to a hostile environment by virtue of a University employee subjecting Jane to discrimination on the basis of her disability and retaliating against Jane for her participation in a Title IX investigation.

**222.**   In this conversation, Ms. Gray appeared to be genuinely concerned, was polite

to Jane and showed a sincere interested in understanding Janes concerns.

**223.** In concluding the conversation, Ms. Gray informed Jane that in order for the University to investigate these matters formally, a formal complaint would have to be made regarding the allegations and claims.

**224.** Therefore, five days later on Tuesday, February 26, 2019 at 5:10 PM via e-mail Jane submitted an official Notice of Discrimination with Texas Southern asserting violations of Federal civil rights, Title IX, the Clery Act, Title II and Section 504 addressed to Ms. Gray and three other University administrators.

**225.** The following day on Wednesday, February 27, 2019 at 4:30 PM as Jane was walking toward the Science Building to visit the LSAMP Lab, she happened to run into the Officer who began the harassment on behalf of Texas Southern Police Department. Jane inquired to the Officer of his name however he did not respond though he followed Jane to the LSAMP Lab. This time he did not enter the Lab though he spectated from a distance.

**226.** When Jane entered the LSAMP Lab the demeanor and communiques of her fellow LSAMP Scholars were incomparable to the days prior. Upon entering the Lab students who normally wouldn't speak to me, spoke and was overtly enthusiastic in doing so.

**227.** This specific day, for the first time during the Spring 2019 term Ms. Tolbert spoke to Jane and with minimal malice. She also provided Jane with her LSAMP scholarship award letter she'd been requesting from Ms. Tolbert since the start of the semester.

**228.** An hour later, at 6:39 PM Jane received an e-mail from BankMobile informing Jane that Texas Southern had a refund disbursement due to Jane in the amount of $1,750.00.

**229.**   This notification left Jane perplexed considering the amount of the refund owed to Jane was of the same monetary value as her NSF stipend and as a nonfinancial aid recipient Jane never received refunds.

**230.**   Thereafter, Jane signed into her Texas Southern student account for clarity. Upon signing into her student account and viewing her account information Jane was made aware that not only had she been administratively withdrawn from enrollment, but her academic and financial records were nonexistent for the Spring 2019 term.

**231.**   Janes student account also reflected a refund owed to her in the amount of her Tiger grant, $573.00 however, Texas Southern did not issue a refund of this University scholarship only Janes NSF's stipend in the amount of $1,750.00.

**232.**   It was as if Jane had never enrolled in any courses for the Spring term at TSU.

**233.**   Per University policy, Texas Southern adheres to the refund or Adjustment of Withdrawals/Dropped Courses policy set forth in the Texas Education Code Title III Higher Education §§ 54.006.

**234.**   Typically, when a student is dropped from enrollment or withdraws from the University their academic and financial records reflect a "W" for grading in the course and charges from that perspective term.

**235.**   However, in Janes case her record of enrollment and academic transcript negated to reflect W's for the Spring 2019 courses she was withdrawn from or a record of refundable and non-refundable fees.

**236.**   Jane notified several University personnel of the administrative withdrawal and none provided support or recommendations to overturn this retaliatory sanction.

**237.** On Monday, March 4, 2019 Jane received a phone call from Ms. Gray to set up a meeting for the following day, March 5, 2019 at 9:30 AM to address her Notice of Discrimination regarding Ms. Tolbert.

**238.** In this phone conversation, Jane informed Ms. Gray she'd been administratively withdrawn from school and Ms. Gray indicated the potential cause could be derived from non-payment of tuition and fees.

**239.** Jane also inquired why Ms. Gray carbon copied Mr. Wendell Williams, TSU's now former Special Assistant to the President in her e-mail request for this meeting. Ms. Gray responded and informed Jane she copied him because he was the actual Title IX Coordinator.

**240.** On Tuesday, March 5, 2019 Jane attended this meeting. This was the first formal meeting regarding the submission of Janes Notice of Discrimination regarding H-LSAMP. Mr. Wendell Williams was present.

**241.** Initially, when Ms. Gray scheduled this meeting, she neglected to mention Mr. Williams would be present. When Jane arrived, she surprisingly was greeting by the two of them.

**242.** The conversation would constitute as hostile and biased and went as follows.

| | | |
|---|---|---|
| 1. | **Mr. Williams:** | *"You look really familiar. Have we met before?"*<br>**[stares at Janes breasts]** |
| | **Complainant:** | **[awkward silence]** |
| | | |
| 2. | **Mr. Williams:** | *"I'm really sorry to hear about your grandmother, are you okay now?"* |

| | |
|---|---|
| **Complainant:** | *"Uh, actually I'm not she was a really big part of my life. I mean people really just don't get over that."* |
| **Mr. Williams:** | *"Right, my mother passed away about 2 years ago or so and I realized it was a couple of stages of that, first missing her and then missing certain things you would do at a certain time during the year."* |
| | **[awkward silence]** |
| | **[additional dialogue]** |

3. | **Ms. Gray:** | *"Um, the first question I have if......* **[stutters]** *... if you've been back to the student center to get any help or anything like that?* |
|---|---|
| **Complainant:** | *"What student center?"* |
| **Ms. Gray:** | *"Um, Um the counseling center with Ms.... Dr. Smith, did you ever follow-up with her?* |
| **Complainant:** | *"I didn't follow up with her to be honest with you because ....um I didn't find the counseling she provided useful, she really just had me revisit the trauma and to me that was just re-traumatizing. However, when I sought counseling at other places like Shield Bearers and University of Houston, they had a more like rigorous counseling treatment plan that actually was better equipped to help me with my issues. I did speak with her you know thinking it'd help but the fact that she'd schedule my next appointment two months later that wasn't as consistent. These people are able to see me on a consistent basis."* |
| **Ms. Gray:** | *"I just wanted to make sure you get the help you need."* **[in a low mumbled tone]** |

4. | **Mr. Williams:** | *"You indicated that the Defendant amicably remedied my complaint prior to litigation therefore dismissing the charges against the Defendant with prejudice. Coincidentally, one of those parties most recently acquired a position in the Office of the Provost at Texas Southern University. What is the name of that party that acquired that position January 1, 2019?"* |
|---|---|
| **Complainant:** | *"Dr. Kendall Harris"* |
| **Ms. Gray:** | *"So, so* **[stutters]** *...really that's a typo you mean 2018 and not 2019?"* |
| **Complainant:** | *"It says that he began his employment here in 2019."* |
| **Ms. Gray:** | *"Well that was just last month Dr. Harris has been with us the whole year."* |
| **Mr. Williams:** | *"The whole year."* **[simultaneously with Ms. Gray]** |
| **Complainant:** | **[stutters]**.... *"It doesn't say that online it says 2019."* |
| **Mr. Williams:** | *"On your on your* **[stutters]** *....your complaint, do you have a copy?"* |
| **Ms. Gray:** | *"Yea."* |

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

| | |
|---|---|
| **Complainant:** | *"Well whenever he began working here. I'm not sure when he began working but following this issue being resolved I came to Texas Southern University under the impression this was a nondiscriminatory environment and the first semester of my education was excellent until my rights were violated and I got a chance to see how you all policies and procedures were and they weren't in align with OCR and DOJ nondiscrimination statutes."* |
| **Mr. Williams:** | *"Okay, ummm."* |
| **Complainant:** | *"So, regardless of whenever he came, he is the only person here that I have knowledge of that has knowledge of this complaint."* |
| **Mr. Williams:** | *"Okayyy...."* |
| **Ms. Gray:** | *"I see."* |
| **Complainant:** | *"And there is legal documentation that documents that."* |
| **Mr. Williams:** | *"Okay."* |

---

| | |
|---|---|
| 5. **Ms. Williams:** | *"You said, this semester you have heard Ms. Tolbert mumble and outwardly make remarks pertaining to the confidential terms of the resolution in question and of the nature of the discriminatory acts...."* |
| **Mr. Williams:** | *"Uh, what were the remarks you heard her make?"* |
| **Complainant:** | *"I would prefer to provide that to you in writing."* |
| **Mr. Williams:** | *"Okay."* |
| **Complainant:** | *"I'll provide a transcript of it for you."* |
| **Mr. Williams:** | *"Because we're going to talk with her, so we need to verify the remarks."* |
| **Complainant:** | *"Yes sir."* |
| | **[additional dialogue]** |

---

| | |
|---|---|
| 6. **Mr. Williams:** | *"Who was the LSAMP Scholar who spewed the derogatory slurs?"* |
| **Complainant:** | *"Asia.... I forgot her last name but it's in my complaint."* |
| **Mr. Williams:** | *"What were the acts described in the statements listed above you said that.... You're gonna put that in writing as well?"* |
| **Complainant:** | *"Yes sir."* |

---

| | |
|---|---|
| 7. **Mr. Williams:** | *"Can you provide us a copy of the resolution that you ... uh* **[stutters]** *... uh mentioned in your complaint?"* |
| **Complainant:** | *"That can be provided to you at a later date because I... If this isn't resolved... If I feel like this is not fairly resolved because I feel like I'm bring valid claims to you. I'm not going attempt to bring something to you if it's not valid. Do you see what I'm saying?"* |
| **Mr. Williams:** | **[interjects]** |

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

| | |
|---|---|
| **Complainant:** | *"Just to be fair to the other person. I don't feel comfortable disclosing that information to you considering everything I've been through, so that information will be disclosed to you at a later point in time. During discovery you can discover that information."* |
| **Mr. Williams:** | **[interjects]** *"Megan let me just try to help you too."* |
| **Complainant:** | *"Yes, sir."* |
| **Mr. Williams:** | *"We want to get to the bottom of it and if you have not been treated fairly, well .... **[pause]** we've got to have as much information as we possibly can."* |
| **Complainant:** | *"Well sir I've already been retaliated against. I don't feel comfortable. I can't even focus here. I feel like I've proven that I'm not a bad student. When I first got here I did very well."* |
| **Mr. Williams:** | *"Okay, so what I'm asking for..."* |
| **Complainant:** | **[interjects]** *"All I'm asking for is for people to treat me with respect and acknowledge my rights. Period. Ms. Tolbert may be disgruntle about whatever issue about this resolution that she is disgruntle about it doesn't matter because its further violating my rights. It's called retaliation. It was none of her business this happened prior to me being here."* |
| **Ms. Gray:** | *"So....**[stutters]**.... so let me ask this. So, what I'm hearing is that there was an incident that happened prior to you coming to TSU with ...involving Dr. Harris?"* |
| **Complainant:** | *"Yes."* |
| **Ms. Gray:** | *"And that Ms. Tolbert is aware of the incident that happened prior to TSU, not something that's happened since you've been here?"* |
| **Complainant:** | *"No."* |
| **Ms. Gray:** | *"Not something that happened prior to you coming here. Got it!"* |
| **Mr. Williams:** | *"And you're saying Dr. Harris is the one that told her that information?"* |
| **Complainant:** | *"I just want it to be known that he is the only person that I reasonably know of that has information about my complaint. My family much less knows information about this compliant. Let alone participants of Texas Southern. I have not informed anybody of that since I've been here."* |
| **Mr. Williams:** | *"Okay, got it."* |

| | | |
|---|---|---|
| 8. | **Mr. Williams:** | *"Are you registered with disability services?"* |
| | **Complainant:** | *"No Sir, I was in the process of getting registered when I was withdrawn from school."* |
| | **Mr. Williams:** | *"Okay."* |

| | | |
|---|---|---|
| 9. | **Ms. Gray:** | *"There was an incident in here that was um.... where you mentioned about the day we had the bomb threat and that Asia was with someone else do you know who that other person is?...."* |

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

| | |
|---|---|
| **Complainant:** | *"Alicia Fontenot."* |

---

| | | |
|---|---|---|
| 10. | **Ms. Gray:** | *"Has Ms. Tolbert ever contacted you outside of....*[**stutters**]*....of TSU? Has she sent you any text messages?"* |
| | **Complainant:** | *"No ma'am."* |
| | **Ms. Gray:** | *"Okay."* |

---

| | | |
|---|---|---|
| 11. | **Mr. Williams:** | *"You indicated that you left some materials in the lab..."* |
| | **Complainant:** | [**interjects**] *This is the resolution I'm referring too. I feel comfortable sharing this information with you all."* |
| | **Mr. Williams:** | *"Okay."* [**grabs my MacBook**] |
| | **Complainant:** | *"If you could just glance over it momentarily."* |
| | **Mr. Williams:** | *"Okay."* [**begins skimming through settlement agreement on my MacBook**] .... *"Thank you."*.... [**provided assistance to Mr. Williams in scrolling through pages**] ... *"Let me go back again."* .... |
| | **Complainant:** | [**Grabs MacBook**] *"So you get the just in summary."* |
| | **Mr. Williams:** | *"Okay."* |
| | **Complainant:** | *"Okay."* |
| | **Mr. Williams:** | *"Those hand-written notes were made by...*[**stutters**]*... by..."* |
| | **Complainant:** | *"The defendant. This was written by the defendant. Signed. This is the draft, I have the original as well."* |
| | **Mr. Williams:** | *"Okay."* [**takes notes**] |
| | | [**prolonged awkward silence**] |

---

| | | |
|---|---|---|
| 12. | **Mr. Williams:** | *"You indicated that when Ms. Arnold finish reading the complaint, that was on the day of the bomb threat. I was over at that meeting I was in the building when that occurred and the LSAMP Scholar who ran off accompanying her laughing and smiling. Who is that person?"* |
| | **Complainant:** | *"Who accompanied Asia? .... Alicia Fontenot."* |
| | **Mr. Williams:** | *"Spell it."* |
| | **Complainant:** | *"F-O-N-T-E-N-O-T"*..... *"I'm not sure how to spell it."* |

---

| | | |
|---|---|---|
| 13. | **Mr. Williams:** | *"In your Exhibit 1, you indicated that you'd gotten all A's but your CS 248 when I looked it had a "W"? Have you worked that W off yet?"* |
| | **Complainant:** | *"It's supposed to be an "I". I have two semesters to address it. I missed something in that class due to me having to address a Title IX issue however in my other 4 courses I got A's in."* |
| | **Mr. Williams:** | *"Have you...have you...*[**stutters**]*... are you still working on that I?"* |

---

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

| | |
|---|---|
| **Complainant:** | *"I was in the process of working through that but as you can see all I went through last semester and everything I've been going through this semester dealing with Ms. Tolbert I haven't even had a chance to really focus. It's not that I am incapable of doing the work. This environment is very hard for me to focus."* |

| | |
|---|---|
| **14. Mr. Williams:** | *"You indicated that her treatment...and I assume you mean Ms. Tolbert, was so disdainful and pronounced that your peers recognized it...Who were those peers?"* |
| **Complainant:** | *"I don't even remember their names, but I remember them by face."* |

| | |
|---|---|
| **15. Ms. Gray:** | *"What were some of the comments they said for you to recognize they knew?"* |
| **Complainant:** | *"It was of the monetary value of the agreement.... The settlement agreement."* |
| **Ms. Gray:** | *"Awwwww, okay."* |
| | *"So, in...help me...*[**stutters**]*... the peers mention the monetary value of the settlement agreement?"* |
| **Complainant:** | *"I didn't say my peers and like I said I'll provide that information to you in writing. Anything you want to know like statements, I'll provide those to you in writing."* |
| **Mr. William:** | *"Okay."* |
| **Complainant:** | *"Because I want to give you a true recollection of events that has happened. I at least thought that in this meeting you would give me the process for the complaint because I sent you questions, and you didn't respond to them."* |
| **Ms. Gray:** | *"I have your questions and I'm going to answer them. I like to do this face to face it's hard for me to...*[**stutters**]*...to... for you to understand my sincerity over the phone I'd rather us talk and build something so you can trust me and know I'll look into your situation that's why I said let's meet, instead of sending questions back to you. It's a little bit...*[**pause**]*... Impersonal."* |
| **Complainant:** | *"Okay maybe I'm an impersonal person."* [**additional dialogue**] |

| | |
|---|---|
| **16. Mr. Williams:** | *"You indicated that you left some materials in the Lab. Was there anything missing from the materials that were left in the lab?"* |
| **Complainant:** | *"Yea I had a pair of earphones that were missing from my iPhone X. I inquired about it to the janitor, but she said she didn't see anything."* |

**Page 45 of 84**

LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY

| | |
|---|---|
| **17. Mr. Williams:** | *"You indicated that on your way to the car you saw a male student give a shirt to Ms. Tolbert...Who was that student?"* |
| **Complainant:** | *"I don't know their names, but I know their faces. If you give me a picture, I'll be able to show you. I've asked their names, but they won't tell me. They don't even talk to me."* |

| | |
|---|---|
| **18. Ms. Gray:** | *"So, I want to make sure that I have a better understanding. There was an event umm...[stutters]... she passed out shirts...[stutters]... She didn't give you a shirt, but she handed out shirts to the people who didn't have a shirt and didn't give you a shirt until after the event was over?"* |
| **Complainant:** | *"Yea."* |
| **Mr. Williams:** | *"Did she invite you to this event?"* |
| **Complainant:** | *"She did the day prior at five PM or approximately five PM."* |
| **Mr. Williams:** | *"I believe that was in one of your Exhibits if I remember correctly...."* |
| **Complainant:** | *"Yes."* |
| **Ms. Gray:** | *"So, she waited until the end of the day to give you a shirt."* |
| **Complainant:** | *"Yes.... this is how I feel."* |
| **Ms. Gray:** | *"That's what I wanna know."* |
| **Complainant:** | *"I've already dealt with things like dealing with Ms. Tolbert, so it was easy for me identify that she was retaliating against me. If I had never been through that before I'd be like...mmmmm.... Maybe.... But no. I was able to identify it because I've been through that before and I know what it defines, and Ms. Tolbert has been retaliating against me and I feel like she feels because of the settlement I should not be a scholarship recipient and I should not have the scholarship as a result of. That is not a part of my income that is a part of something I lost that no monetary value would ever replace. So, it's not even about that I would much rather not have my rights violated than to even have to deal with it at that level and that's what I'm trying to do now. That's the reason why I went through the lengths. As you can see that was a very lengthy report. I went through the lengths to report that to you, so it doesn't get that far because it doesn't have to."* <br> **[prolonged awkward silence]** |

| | |
|---|---|
| **19. Mr. Williams:** | *"You indicated that her discriminatory treatment didn't begin until your notification of your disability to the LSAMP committee and her acquiring knowledge of your LSAMP complaint by....* **[stutters]** *...confirmation of her retaliatory statements... How was she notified of your disability?"* |
| **Complainant:** | *"I did via email which was in one of my Exhibits.... I emailed Ms. Tolbert...... Dr.......the rest of them...."* |

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

| | |
|---|---|
| Mr. Williams: | *"Okay...and the same way as your Title IX complaint was via email as well."* |
| Complainant: | *"Yes."* |
| Mr. Williams: | *"Same thing with the two veteran LSAMP students. If you had pictures, you'd be able to identify them as well...."* |
| Complainant: | *"Yes."* |
| Mr. Williams: | *"Okay."* |

| | | |
|---|---|---|
| 20. | Ms. Gray: | *"So, was there any conversation... I know you notified them via email but was there any verbal conversation she had with you about your disability?"* |
| | Complainant: | *"No, I informed her, and she just told me to do better..."* |
| | Ms. Gray: | *"Okay."* |

| | | |
|---|---|---|
| 21. | Mr. Williams: | *"You provided a copy of the notification that you were in LSAMP and it said in there see attached for...uhh...[stutters]... terms or agreement...do you have a copy?"* |
| | Complainant: | *"She never gave me those I provided to you what all Ms. Tolbert ever gave me. To be honest with you a lot of the ways she handled business was not done properly. That's why my stipend didn't post to my account until October.... School started in August."* |

| | | |
|---|---|---|
| 22. | Mr. Williams: | *"You indicated you weren't awarded the LSAMP award... [stutters] what was the date of that award?"* |
| | Complainant: | *"It was awarded in August of 2018."* |
| | Ms. Gray: | *"But it wasn't posted until October?"* |
| | Complainant: | *"She would send us to go to financial but when we'd visit financial aid the financial aid advisors would tell us that Ms. Tolbert had to send them that information. I can send you a screenshot of that as well. She was telling us to go handle this, but these are things she should've been handling. The other Scholars feel indebted to Ms. Tolbert because they feel like oh my God Ms. Tolbert has blessed me with this money. I've been able to go to school, I will never betray her, oh my God Megan you're such a horrible person. It is not fair to people who are participants of this program to be left disadvantaged. I feel like I could've done better. I'm a good student and if Ms. Tolbert had told me Megan this is what you need to do. Go to the Office of Disability Services.... How do you I know that if I've never had to register?"* |

| | | |
|---|---|---|
| 23. | Mr. Williams: | *"Ummm.... So, the essence of your...usually first and foremost* |

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

|  | *your documentation and how well you put your complaint together was great. Normally this first meeting we have we'd be telling you to tell us your story. Tell us what happened but you had everything laid out that all we had to do was go through and ask questions about clarification and things we didn't have. So, your basic complaint...Was it due to Ms. Tolbert's absences or was it due to your disability? What was the reason for your lack of performance?"* |
|---|---|
| **Complainant:** | *"I just feel like it was a trickling effect. I feel like first of all I was really punished for doing poorly. Most people are like oh I had a lot going on that's why I didn't do well. I feel like my documentation proved that I had a lot going on. Like I was already working through my problems and I was doing good. Already addressing your mental health that stigma is already looked down upon in our community, so I was already look at indifferent for that. I am not going to feel bad about that because its real and it can happen to anybody so I'm not going to feel bad about something like that."* |
| **Mr. Williams:** | *"So..."* |
| **Complainant:** | *"She just didn't do anything and when I did poorly it was like oh you're making me look bad and it was in contribution to her making statements about this...."* |

24. | **Mr. Williams:** | *"So...... [stutters]... You were not able to perform all the requirements for the LSAMP program last fall?"* |
|---|---|
| **Complainant:** | *"Yet I was the only person who got my money cut. On the list of reasons to cut money there were other reasons like not complying with lab hours. Ms. Tolbert doesn't care about that as long as you're bringing in the grades. I'm like if I would've known that I wouldn't have not came in here 15 hours a week. That's a big sacrifice, I am a mom."* |

25. | **Mr. Williams:** | **[interjects]** *"So your grades were affected because of the....?"* |
|---|---|
| **Complainant:** | **[interjects]** *"It was the combination. It was a lot going on, but I've been through a lot. I was still coming here but the environment in the Lab, Ms. Tolbert not being there. I'm thinking this is a requirement. So, even though I failed in the process of trying to comply with this requirement I still tried, and my money was still cut. People who didn't come, as long as you're making good grades as long as you're making NSF look good, you're good you can get your money and you can get extra money If you do little stuff for me here and there."* |

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

| | |
|---|---|
| **26. Mr. Williams:** | *"So when was Ms. Tolbert... when do you believe Ms. Tolbert was told about your previous..."* |
| **Complainant:** | **[interjects]** *"Obviously over winter break. It was very different. It was like night and day."* |
| **Ms. Gray:** | *"So..."* |
| **Complainant:** | *"It was literally like night and day that's the reason why I went through the extent."* |
| **Mr. Williams:** | **[interjects]** *"So you believe she found out from Dr. Harris over the winter break?"* |
| **Complainant:** | *"I'm assuming. She could've found out that way or some other type of way."* |
| **Mr. Williams:** | *"So the fall semester she never mentioned anything?"* |
| **Complainant:** | *"No. I want.....I want to let you know that even from now he's the only person that I reasonably know that has knowledge of this agreement here. I want that to be on record. Number two, I don't know how Ms. Tolbert acquired that information however he is the only person I reasonably know of that has that information."* |
| **Mr. Williams:** | *"But during the fall semester any type of action she made against you was not due to her knowledge or so?"* |
| **Complainant:** | *"Ms. Tolbert was still "Hey Megan how ya doin?" she was still.... It was just night and day."* |
| **Mr. Williams:** | *"Did it change after she saw your grades for the fall?"* |
| **Complainant:** | *"It was just about that time.... It was when the Spring semester started. There is a difference between you being disappointed with a student about their grades and the manner in which Ms. Tolbert treated me....* **[additional dialogue]** *Every person that came to speak to me she interrupted. She didn't want people speaking to me. It's a difference between you being disappointed it's just like ohhhh this girl is a little more than what I thought. She didn't think much of me when I came to apply for the scholarship...I'll give her money blah blah blah now that she knows something about me, she's feeling some type of way and her feeling some type of way is called retaliation."* |
| **Mr. Williams:** | *"Okay and that concludes my questions... Ms. Gray."* |

---

| | |
|---|---|
| **27. Ms. Gray:** | *"So just to answer your questions, you asked how long will it take TSU to conduct a formal investigation. So, our policy says that.... um....* **[stutters]** *says it's 60 calendar...I mean business days. So, what we're doing now that's why we asked the questions so we can get to the "krugs" so we can interview and talk to other people and we can come to a conclusion as soon as we can. Um..... it says....um what interim measures to address the discriminatory acts. Right now......"* |

---

| | |
|---|---|
| **28. Mr. Williams:** | **[interjects]** *"Are you a currently a student? You're not are you?"* |

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

| | |
|---|---|
| **Complainant:** | *"No I was administratively withdrawn from the University...."* |
| **Mr. Williams:** | **[interjects]** *"For?"* |
| **Complainant:** | *"I'm not sure I haven't been given a merit or basis?"* |
| **Mr. Williams:** | **[interjects]** *"Was it for non-payment? When was it done?"* |
| **Complainant:** | *"It was done following my email to her..."* |
| **Ms. Gray:** | **[interjects]** *"So..."* |
| **Complainant:** | *"To Ms. Gray."* |
| **Mr. Williams:** | *"We'll find out the reason for your administrative withdrawal."* |
| **Complainant:** | *"Whether it was for whatever explainable reason, whether it was for non-payment I did not make a payment on last semesters tuition until this semester. So that was okay last semester but now that I have a complaint in process it's not. So, either way I feel like that was an adverse action toward me in response to me reporting these discriminatory acts."* |
| **Mr. Williams:** | **[interjects]** *"So, when did you register for classes?"* |
| **Complainant:** | *"I registered on January 30, 2019."* |

| | | |
|---|---|---|
| 29. | **Mr. Williams:** | *"So, you had an installment plan last year and you didn't make a payment on your installment plan?"* |
| | **Complainant:** | *"I didn't. Not until this semester and I was still able to finish my classes. I didn't make a payment until January 4, 2019."* |
| | | **[awkward silence]** |
| | **Mr. Williams:** | *"Okay."* |
| | | **[prolonged awkward silence]** |
| | **Mr. Williams:** | *"Okay."* |
| | **Complainant:** | *"Actually, Friday January 25th was when I was advised by Dr. Ghemri and registered by her. On that Saturday, the 26th I web registered in one course totaling 12 hours."* |
| | **Mr. Williams:** | *"So, they wouldn't allow you to register until you had paid your balance?"* |
| | **Complainant:** | *"Yes."* |
| | **Mr. Williams:** | *"Okay....and when you registered did you sign an installment agreement for this semester."* |
| | **Complainant:** | *"I did it online and then I got an email saying my installments changed and after that I got an email from Texas Southern saying I was issued a refund."* |
| | **Mr. Williams:** | *"Okay so let me just do the research on that."* |

| | | |
|---|---|---|
| 30. | **Mr. Williams:** | *"So you believe that your negative action from this semester was due to filling a Title IX Case?"* |
| | **Complainant:** | *"Yes, it is the reason I was withdrawn because it's not for non-payment I didn't pay yall for last semester until this semester* **[starts laughing]** *this is funny. It's so funny..."* **[continues laughing]** |
| | **Mr. Williams:** | **[interjects]** *"Do you remember...."* |

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

| | |
|---|---|
| **Complainant:** | **[interjects]** *"All you have to do is, it's very simple there is a law there are rules put in place like you just have to follow them that's all."* |

---

| | |
|---|---|
| **31. Mr. Williams:** | *"Do you remember when you signed the agreement last semester the installment agreement?"* |
| **Complainant:** | *"I didn't sign one someone administratively enrolled me in one I got an email saying an administrator enrolled me in an installment plan because I didn't."* |
| **Mr. Williams:** | *"Did you respond to that email?"* |
| **Complainant:** | *"I didn't because an administrator enrolled me in one and I'll send you a correspondence later on this evening with that information."* |
| **Mr. Williams:** | *"Please do that..."* |
| | **[awkward silence]** |
| **Mr. Williams:** | *"Okay..."* |
| | **[prolonged awkward silence]** |
| **Complainant:** | *"Can I ask a question that's un related to this, I'm not trying to be rude or disrespectful because I'm coming to you guys in a professional manner seriously but is this just what happens in the educational system like people do things at one university and they just go to another? Like you allow people into your administration who has even been..."* |
| **Mr. Williams:** | **[interjects]** *"To answer that question would assume what you're saying is correct. So, I have to investigate your allegation before I can answer that question."* |
| **Complainant:** | *"Okay, so you guys don't do background checks to see whether these people have committed or have been alleged of discrimination?"* |
| **Mr. Williams:** | **[interjects]** *"Every person employed at TSU has done a background check."* |
| | **[prolonged awkward silence]** |

---

| | |
|---|---|
| **32. Mr. Williams:** | *"Do you have any more questions?"* |
| **Ms. Gray:** | *"I don't."* |
| **Mr. Williams:** | *"Okay."* |
| **Ms. Gray:** | *"Do you have any questions for us?"* |
| **Complainant:** | *"Um...no...wait, so you guys are not going to address the issue of me being out of school?"* |
| **Mr. Williams:** | *"We're.... I'm...***[stutters]** *.... I'm...that's part of our investigation and I gotta figure out why."* |
| **Ms. Gray:** | *"Alrighty then... you have my email... you can always call me or email me..."* |
| **Complainant:** | **[laughs]** *"You guys are hilarious"* **[continues laughing]** *"This was nice..."* |
| | **[awkward silence] [gathers things]** |

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

| Mr. Williams: | *"Thank you."* |
| | **[tries to open door for me while starring at my breast]** |
| Complainant: | *"I got it."* |
| Ms. Gray: | *"Have a good day."* |
| Complainant: | *"You as well."* |
| Ms. Gray: | *"Stay warm."* |
| Complainant: | *"You as well."* |

**243.** The entirety of this meeting including both Ms. Gray and Mr. Williams hostile demeanor and tone, their court ready attire and Mr. Williams surprised appearance were purposeful acts to intimidate and dissuade Jane from continuing in the formal complaint process and was devastating to Jane as she expected and anticipated support.

**244.** On Tuesday, March 5, 2019 at 11:57 AM Jane visited Ms. Nadareh Jahedmotlagh, the Administrative Assistant in the Department of Computer Science and inquired of the process to reverse administrative withdrawals.

**245.** Ms. Jahed advised Jane to speak with upper administration in COSET regarding this matter.

**246.** In this advice provided Jane visited the Deans office later that day and Ms. Charlette Whaley scheduled Jane an appointment for Thursday March 7, 2019 at 1:30 PM to speak with Dean Serpil Saydam, the Dean of the College of Science, Engineering and Technology regarding Janes enrollment status as a student in COSET's Department of Computer Science.

**247.** Dean Saydam was a recipient of Janes complaint regarding Ms. Tolbert.

**248.** On Wednesday, March 6, 2019 at 9:14 AM Jane visited Mr. Chio Sheppard, a

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

recipient of her two grievances regarding her discriminative incomplete denials, to receive a follow up.

**249.**   Mr. Sheppard was professional, kind to Jane and showed a genuine interest in the concerns arising in Janes grievances. He informed Jane that the investigation would take some time as her wanted to assure my concerns were addressed properly.

**250.**   Jane too shared with Mr. Sheppard that she'd been administratively withdrawn form enrollment at Texas Southern. He apologized for what Jane was going through and reassured her that as he is a voice for students, and he'd make sure Janes voice was heard.

**251.**   He too informed Jane that he'd present her concerns to the Provost, Kendall T. Harris for investigation.

**252.**   On Thursday, March 7, 2019 at 1:33 PM Jane attended her meeting with Dean Saydam.

**253.**   In this meeting similar as before, Dr. Jackson a Professor and the Assistant Dean for Student Services and Instructional Support in COSET was an unexpected surprised visitor in this meeting.

**254.**   Jane explained to the two of them that she'd been administratively withdrawn from the University despite having had an installment agreement in place.

**255.**   They both seemed to be genuinely unaware and in response Dr. Jackson expressed that the College of Science, Engineering and Technology posted additional scholarship awards to students accounts to prevent students from being withdrawn for nonpayment in an effort to keep low enrollment numbers up in COSET and overall within the University.

**256.**   She also informed Jane that was the reason Jane was awarded additional funds from a COSET Scholarship in the amount of $573 per semester term.

**257.**   Jane also inquired why I was issued a refund in the amount of $1750, the monetary value of my LSAMP/NSF stipend subsequent the withdrawal.

**258.**   Dr. Jackson responded and informed Jane that was unheard of and extremely usually considering when the University drops students for non-payment, they'd always keep a percentage if not all of the credited funds to a student's account.

**259.**   During the course of this conversation, Dr. Saydam minimally spoke. She was having extreme difficulty effectively expressing herself in the English dialect.

**260.**   Subsequent Texas Southern administratively withdrawing Jane from enrollment and Jane reaching out to numerous faculty and staff for assistance, TSU-PD's harassment continued and ultimately drastically worsened.

**261.**   On Friday, March 8, 2019 at 4:57 PM Jane arrived on campus to speak with Mr. William's regarding her Notice of Discrimination filed against Ms. Tolbert.

**262.**   As Jane began walking toward the direction of the Office of the President located in Mack H. Hannah Hall a TSU-PD Officer passed her slowly while observing her.

**263.**   Feeling fearful of further harassment, Jane decided not to speak with Mr. Williams and returned to her car parked along Ennis just before the faculty parking entrance. Moments later at 5:04 PM the patrol car returned in the opposite direction and sat at the entrance of Lot F (faculty parking) for several minutes until Jane entered her vehicle.

**264.**   Thereafter Jane sat in her car and cried hysterically. She was not only heartbroken that she couldn't continue her education and pursue her dreams but at the severe

retaliation at the hands of TSU-PD while acting under the color of law.

**265.** While Jane was in her car crying a TSU – PD patrol car approached Janes vehicle again at 5:13 PM, this time from the opposite direction.

**266** In frustration of the constant harassment Jane decided to follow the patrol car to the Police Department so she could file an official police report.

**267.** When Jane followed behind the Officer, the Officer began driving at an almost nonexistent speed as opposed to their normal excessively speedy driving.

**288.** When Jane and the Officer arrived at the East Garage at 5:48 PM where the Police Department is housed, Jane got a complaint form from Officer C. Jones and he advised Jane to return during his shift between the hours of 3:00PM to 11:00PM to submit her complaint.

**269.** This Friday Spring Break had begun; therefore, Jane postponed her quest for explanation regarding her administrative withdrawal with University personnel until school resumed Monday, March 18, 2019.

**270.** The following day Saturday, March 9, 2019 Jane went to the LSAMP Lab to reflect on the harassment she wanted to report to TSU Police.

**271.** Jane was in the Lab approximately 35 minutes before leaving at 4:24 PM. As Jane was leaving the Science building and began walking toward her vehicle, she noticed a TSU – PD patrol car sitting in the middle of campus with all windows down in view of the Science Building where Janes vehicle was parked. As Jane walked closer to her car the Officers began driving away, slowly.

**272.** Immediately after, on Saturday, March 9, 2019 at 5:54PM Jane filed an official

police report of harassment from TSU-PD and LSAMP Scholars with Texas Southern's Department of Public Safety Officers C. Jones and Christopher Robinson. The Department however never investigated Janes concerns.

**273.** The next day Sunday, March 10, 2019 at 1:17 PM Jane went to the LSAMP Lab this time to bring some printer paper she'd purchased for the printer so she could print consent forms NSF's Compliance Manager Mr. Robert Cosgrove emailed her.

**274.** Jane was the only person on campus as it was Spring Break. When she arrived and parked, she noticed two TSU patrol cars parked in the middle of the field behind the Science Building backed in at opposite directions with the Science Building in view.

**275.** After filling the printer with paper and printing NSF's consent forms Jane left the Lab at 1:36 PM. The two patrol cars backed in at opposite directions were still in the same location.

**276.** As Jane was walking toward her car one of the patrol cars drove away and the other stayed and continued observing Jane. When Jane drove off the patrol car that drove away followed Jane until she was off campus and soon to enter the North freeway.

**277.** Over Spring Break Jane researched her options of re-enrollment and found a provision afforded to administratively withdrawn students in COSET's current Student Handbook, though it was last published for the 2016-2017 academic year.

**278.** Per the expired Student Handbook "*Students who are administratively withdrawn from their classes because of nonpayment of tuition and fees may petition for reinstatement if and only if extraordinary circumstances prevail. Students may obtain the prescribed form in the Registrar's Office and must return the petition with evidence of*

*suitable payment by-case basis. All approved petitions are subject to a late payment fee and a reinstatement fee."*

**279.** Therefore, when school resumed on Monday, March 18, 2019 at 12:49 PM Jane visited the Office of the Registrar to retrieve the required form for submission to be reinstated.

**280.** When she arrived at the Registrar's Office the woman, who was assisting patrons had an evident unwillingness to assist Jane in particular. She was rude and her tone was hostile form the start of conversation.

**281.** Jane informed her that she'd been administratively withdrawn from the Spring 2019 term and requested the reinstatement form.

**282.** Initially, the woman was completely unaware of this provision and form Jane requested and in response reluctantly informed Jane she had no idea what she was referring to with an attitude.

**283.** Jane then showed the woman pages of the COSET Student Handbook she'd printed that stated this information and after reading it the woman had an epiphany and recollection of this provision, denied Janes request and hostilely inferred that per the Provost, Dr. Kendall Harris's advisement the Office of the Registrar could no longer provide the form nor would Dr. Harris accept any additional reinstatement request.

**284.** The following day, Tuesday, March 19, 2019 at 10:42 AM Jane called Thurgood Marshall School of Law, Law Library to inquire whether it was open to the public or only to law students.

**285.** The representative that assisted Jane over the phone inquired of Janes name and

when she planned to visit. Jane informed them of her name and that she wanted to visit that day. In response, they informed me that was okay.

**286.** At 11:04 AM as Jane was walking from the West Parking Garage down the Tiger Walk toward the Law Library, Jane noticed a TSU-PD patrol car that was parked in between the Robert James Terry Library and the Samuel Milton Nabrit Building facing the Tiger Walk in the Direction Jane was walking from.

**287.** The officers sat in the patrol car and observed Jane as she continued to walk toward the Law Library.

**288.** When Jane arrived at Thurgood Marshall Law School it was 11:14 AM. As Jane entered the building, Jane went to the circulation desk to inquire where the Law Library was located.

**289.** There Jane was greeted by an angry TSU-PD Officer. An employee of the Law School was seated next to him. Jane inquired where the Law Library and the restrooms were. The employee did not verbally answer Jane neither did the Officer, but the Officer pointed to the east.

**290.** When Jane finished using the toiletries the angry TSU-PD Officer had left. The Law School employee who was seated next to the Officer and another unidentified Law School employee, were at the circulation desk blankly staring at Jane and continued until Jane entered the Library.

**300.** While in the Law Library Jane received an e-mail from Dr. Baker, the Interim Chair for Barbara Jordan – Mickey Leland School of Public Affairs stating Janes grievance regarding Dr. Gilbert was unsupported with an explanation that her request for reasonable

accommodations was not made until January 29, 2019 after the conclusion of the Fall 2018 term.

**301.** The basis for Janes grievances was not of Texas Southern's failure to provide reasonable accommodations however it was of a complaint of discrimination due to Janes Incomplete denials being denied on the basis of her disability amongst other protected classes.

**302.** Moreover, Dr. Baker and his Appeals Committee were not identified in TSU's Title II/ Section 504 Policy, MAPP 02.05.15 as responsible parties for Title II/Section 504 compliance.

**303.** Therefore, Dr. Baker nor his Appeals Committee had jurisdictional authority to investigate and provide investigatory findings regarding sensitive matter as such.

**304.** Hence, Dr. Baker and his appeals committee unlawful investigation is in too violation of Federal law in respects to Title II and Section 504.

**305.** Jane felt devastated, violated, alienated, fearful and anxious but adamant about researching the information needed to properly pursue to Federal suit regarding violations her Federal civil rights.

**306.** While a Library employee was assisting Jane in finding legislation on Federal civil rights the same angry Police Officer walked past the aisle, Jane and the employee were on at minimum 7 times.

**307.** After about 30 minutes of reading Jane left the library. As Jane exited the Library around 11:42 AM and entered the foyer of the Law School, Jane heard someone say, "There goes the crazy girl" (Jane assumed to be referring to my PTSD diagnosis) and all the

employees and students in the foyer turned to look at Jane.

**308.**   Jane was utterly humiliated.

**309.**   A woman who was in motion walking in front of Jane too stopped to turn and look at Jane as well.

**310.**   At 11:46 AM while Jane was walking back to the Technology Building Jane saw the same TSU – PD Officers she'd seen 45 mins prior parked. Only this time their patrol car was facing the opposite direction with the Law School in view.

**311.**   Again, the Officers observed Jane movements until she was out of their vicinity.

**312.**   Jane arrived at COSET's Technology Building around 1:00 PM. After entering the building, she went to the third floor to visit with some friends and a few minutes later Jane and friends began walking to their cars parked in the West Garage at 1:17 PM.

**313.**   TSU – PD was circling the Technology Building as they were leaving. They had their mobile scooters parked outside the entrance.

**314.**   When Jane passed the Tech Building moments later at 1:29 PM, they'd gone.

**315.**   Over the course of the Spring term, every time Jane saw a Security Officer named C. Armitige in COSET's Technology Building when she'd see me, she'd began writing in a red pad or she'd follow me around and write in it.

**316.**   On Thursday, March 21, 2019 at 10:58 AM when Jane entered the Tech Building, Jane saw her grab her pad and begin writing as she'd also do so Jane inquired to her what was her purpose in doing so.

**317.**   Officer Armitige, in response informed Jane that Chief Young wanted her to

keep notes on activity going on in the Tech building. Thereafter, Jane concluded the conversation and went to class.

318.   At 1:11 PM when Jane was leaving the Tech Building, Officer Armitige was still sitting at the circulation desk. She was speaking with another security officer and a student.

319.   Jane exited the building and began walking down the Tiger Walk toward her car. A security officer was waiting outside on a golf cart. When Jane began walking, he began driving in the direction Jane was walking while observing Jane intensely.

320.   The Officer continued to drive down to the barricade made a U-turn then continued his observations until he passed Jane again in close proximity.

321.   Jane felt unsafe and was terrified and afraid. Jane personally knew a student whom was too a student in COSET that the University filed a fictions mental health warrant for alleging the student was mentally ill to prevent the student from objectifying University malfeasance and administration wrongdoing. This student was restrained at Harris County Psychiatric Center without release until he agreed to be treated and registered with such mental illness. He thereafter has to forfeit pursing his postsecondary education.

322.   The following day, Friday, March 22, 2019 Dr. Chantelle W. Link, the Assistant Provost of Academics and Executive Director of TSU Online responded to both Title II/Section 504 grievances regarding Janes Incomplete denials on behalf of the Office of the Provost.

323.   Dr. Link's report was of the same investigative findings as Dr. Baker.

324.   In her response she stated Incompletes are given at the discretion of the faculty

member though the policies enforced in COSET's current, but outdated Student Handbook stated otherwise.

**325.** Additionally, per Title II and Section 504 regulatory promulgations, the Office of the Provost negates to possess jurisdictional authority to investigate matters related to disability discrimination concerns or to make conclusive decisions relating to such matters as these concerns are to be investigated by the designated ADA/Section 504 Coordinator.

**326.** Hence, Dr. Link and the Office of the Provost unlawful investigation into Janes discrimination complaints too violated of Federal law.

**327.** On Thursday, March 28, 2019 Jane went to the Office of the President located in Mack H. Hanna Hall to get an update from Mr. Wendell Williams on her Title IX grievance.

**328.** Mr. Williams informed Jane that he was having a hard time contacting the witnesses in her complaint so he could not provide an exact time of when he would complete his investigation.

**329.** In return Jane informed him that the witnesses he was referring to were on campus daily in the LSAMP Laboratory.

**330.** He then questioned why Jane was still on campus when she'd been administratively withdrawn from her courses.

**331.** Jane then informed him she had an Incomplete from two semesters prior that she was attempting to satisfy.

**332.** At 11:23 AM, while walking down the Tiger Walk a TSU-PD patrol car was parked near the curb. The Officers observed me until I was near to the West Garage.

**333.** While Jane was walking down the Tiger Walk to her vehicle 11:23 AM, a TSU-PD patrol car was parked near the curb. The Officers observed jane until I was near to the West Garage.

**334.** On April 11, 2019 Jane received a response from Attorney Cheryl Cash, Texas Southern's now former Associate General Counsel or otherwise previously inferred to as the "*Interim Deputy Title IX Coordinator and EEO Officer*" in TSU policy **MAPP 02.05.15.**

**335.** She provided Jane with the investigative findings from Mr. Wendell William's investigation into Janes grievance of discriminative acts perpetuated by Ms. Tolbert's discrimination, retaliation and harassment.

**336.** Mr. Williams investigative findings too returned Janes complaints of Title IX, Title II and Section 504 discrimination to be unsupported by the 46 exhibits provided.

**337.** On June 4, 2019 Jane received another response from Attorney Cash this time providing the investigative findings from investigations Mr. William's conducted into my Title II/Section 504 grievances regarding Janes Incomplete denials.

**338.** Though Janes disability discrimination complaints were submitted before her Title IX complaint regarding Ms. Tolbert, the University showed it minimal attention and surpassed the investigation conclusion deadline by 88 days past the 21-day investigation timeframe provided in the University's expired ADA/504 Policy **MAPP 02.05.15.**

**339.** Similarly, Mr. Williams investigative findings returned that Janes complaints of discrimination on the basis of her disability to be unsupported by the evidence provided.

**340.** A few days later, on June 11, 2019 Dr. Bobby L. Wilson and Dr. Willie Taylor mailed Jane a letter informing Jane that Texas Southern's Louis Stokes Alliance for Minority

Participation retracted her scholarship and membership in the scholastic alliance. This was adverse action towards Janes objection of discrimination and disclosure of H-LSAMP's misallocation and abuse of Federal funds dispersed from the National Science Foundation.

341.   Despite Janes administrative withdrawal she'd often visit Texas Southern to utilize their Library Learning Center and Law Library. During these visits on numerous occasions Jane was harassed, followed and retaliated against by TSU-PD Police Officers.

342.   Jane too attempted to register for enrollment at Texas Southern for the Fall 2019 term however Janes student account status had a registration hold preventing her enrollment.

343.   Jane was even ticked by the City of Houston, on behalf of TSU while having legally parked in a location she'd parked for almost two years.

344.   In addition to this petition to the U.S. District Court for the Southern District of Texas, Jane too reported these concerns to numerous local, State and Federal investigatory agencies with jurisdictional authority over the operations of Texas Southern University including but not limited to the U.S. Department of Justice, the U.S. Department of Education, the National Science Foundation, the Texas State Auditor's Office, Harris County District Attorney's Office, the United States Attorney's Office, the Southern Association on Colleges and Schools Commission on Colleges, the Section of Legal Education of the American Bar Association.

345.   As of the date of filing of this petition, Thursday, March 12, 2020 none of the reported agencies have responded or provided conclusive findings regarding Janes claims.

# VI. HISTORY OF TEXAS SOUTHERN

**346.** As aforementioned, subsequent Janes submission of her second Title IX complaint regarding TSU's incompliance with Title IX, TSU Title IX Coordinators Ms. Kiesha David and Ms. Ja'Wana Green were fired at the start of the Fall 2018 term.

**347.** Thereafter, the University operated incompliant with the Title IX Federal statute without a designated Title IX Coordinator or any Federal Civil Rights Compliance Officer for that matter as forth in the U.S. Department of Education and the U.S. Department of Justice promulgations.

**348.** Between September 8, 2018 until August 20, 2019 and thereafter Texas Southern sought to hire a Title IX Coordinator and posted more than 20 ads requesting applicants. These adds were posted on the various platforms including, Higher Education Jobs, Work in Texas Veteran Jobs, the Texas Workforce Commission, Inside Higher Ed Jobs, Inside Higher Ed Careers, ChronicleVitae, Red Hired, USA Jobs, LinkedIn, Glassdoor, ZipRecruiter, Academic Gates's and Neurodiversity Advisors Inc.

**349.** As aforementioned, TSU's Associate General Counsel or otherwise referred to as the "*Interim Deputy Title IX Coordinator and EEO Officer*" was fired approximately in September of 2019.

**350.** In a phone conversation with Jane on Tuesday, March 5, 2019, to schedule a meeting regarding her Title IX complaint, Ms. Gray denied being the Title IX Coordinator and informed Jane that Mr. Wendell Williams, TSU's now former Special Assistant to the President served as the Title IX Coordinator.

**351.** On January 5, 2020 Texas Southern's now former President Dr. Austin A. Lane and his Special Assistant Mr. Wendell Williams were fired from their administrative positions due to the illicit engagement in criminality, embezzlement and Federal fraud.

**352.** In a news interview with the Houston Chronicle on January 15, 2020, on record Mr. Wendell Williams expressed that amongst his other administrative roles, he served as Texas Southern's Title IX Coordinator.

**353.** In addition to operating incompliant with regard to Title II, Section 504, Title VI and Title IX due to discrepential and expired policies Texas Southern too negligently operated with regard to 100 pertinent expired polices from nearly a decade ago.

**354.** These policy inaccuracies are as follows.

| Board of Regents Policies | | | |
|---|---|---|---|
| **Policy Name** | **Last Effective Date** | **Expiration Date** | **Time Expired** |
| Board Policies – Table of Content | April 29, 2011 | April 29, 2017 | 2 Years 7 Months |
| Board Policy Section I – General | April 29, 2011 | April 29, 2017 | 2 Years 7 Months |
| Board Policy Section II – Academic and Student Affairs | April 29, 2011 | April 29, 2017 | 2 Years 7 Months |
| Board Policy Section III – Administration and Finance | April 29, 2011 | April 29, 2017 | 2 Years 7 Months |
| Board Policy Section IV – Audit | April 29, 2011 | April 29, 2017 | 2 Years 7 Months |
| Board Policy Section V – Development and Legislative | April 29, 2011 | April 29, 2017 | 2 Years 7 Months |
| Board Policy Section VII – Buildings and Ground | April 29, 2011 | April 29, 2017 | 2 Years 7 Months |
| Board of Regents By Laws | April 24, 2009 | April 25, 2015 | 4 Years 7 Months |

| Human Resource Policies | | | |
|---|---|---|---|
| **Policy Name** | **Last Effective Date** | **Expiration Date** | **Time Expired** |
| 02.01.02 Employee On-Boarding Policy | March 2016 | Sept 1, 2019 | 3 Months |
| 02.02.01 Pay Guidelines for Staff Employees | March 2016 | Sept 1, 2019 | 3 Months |
| 02.02.02 Classification of Staff Jobs | March 2016 | Sept 1, 2019 | 3 Months |
| 02.02.03 Overtime/Compensatory Time | March 2016 | June 1, 2019 | 6 Months |
| 02.02.07 Additional Compensation - Exempt Staff | March 2016 | July 1, 2019 | 5 Months |
| 02.02.08  Consulting and Outside Employment | March 2016 | May 1, 2019 | 7 Months |
| 02.03.01 Benefits Summary Guidelines | March 2016 | May 1, 2019 | 7 Months |
| 02.03.02 Family and Medical Leave Policy | August 2016 | August 31, 2019 | 4 Months |
| 02.03.03 Parental Leave Policy | August 2016 | August 31, 2019 | 4 Months |
| 02.03.04 Leave of Absence Policy | August 2016 | Sept 1, 2019 | 3 Months |
| 02.03.05 Educational Opportunities | August 2016 | Sept 1, 2019 | 3 Months |
| 02.03.06 Moving and Relocation Expenses | Nov 16, 2018 | Nov 16, 2018 | 1 Year |
| 02.05.03 Discipline and Termination Policy | April 28, 2014 | April 28, 2017 | 2 Years 8 Months |
| 02.05.06 Fraud Policy | August 2016 | October 1, 2019 | 2 Months |
| 02.05.11 Sexual Harassment Policy | **No effective date** | **No effective date** | ∞ |
| 02.05.12 Work Schedules | July 2013 | July 2016 | 3 Years 4 Months |
| 02.05.13 EEO/Non-Discrimination Policy | June 2015 | June 2018 | 1 Year 6 Months |
| 02.05.15 Americans with Disability Act/504 Policy | Sept 2013 | No effective date | 6 Years |
| 02.06.01 Drug-Free Campus Policy | Aug 5, 2013 | Aug 5, 2016 | 3 Years 3 Months |

LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY

| Human Resource Policies | | | |
|---|---|---|---|
| Policy Name | Last Effective Date | Expiration Date | Time Expired |
| 02.06.02 Smoking Policy | April 28, 2014 | April 28, 2017 | 2 Years 8 Months |
| 02.06.03 Communicable Diseases Policy | June 24, 2009 | June 24, 2012 | 7 Years 6 Months |

| General Administration Policies | | | |
|---|---|---|---|
| Policy Name | Last Effective Date | Expiration Date | Time Expired |
| 01.01.01 Administrative Memoranda System | Aug 5, 2013 | Sept 1, 2016 | 3 Years 3 Months |
| 01.02.01 Business Administration | June 24, 2009 | Aug 31, 2012 | 7 Years 4 Months |
| 01.03.01 Baseline Standards | June 24, 2009 | Jan 1, 2012 | 8 Years |

| Student Services Policies | | | |
|---|---|---|---|
| Policy Name | Last Effective Date | Expiration Date | Time Expired |
| 05.01.01 Freedom of Expression | April 16, 2010 | Sept 1, 2013 | 6 Years 2 Months |
| 05.02.01 Freshman Residency Requirement Policy | April 28, 2014 | May 1, 2017 | 2 Years 7 Months |

| Academic Policies | | | |
|---|---|---|---|
| Policy Name | Last Effective Date | Expiration Date | Time Expired |
| 06.02.01 Policy of Distribution of Recovered Facilities and Administrative Cost | June 24, 2009 | Sept 1, 2012 | 7 Years 3 Months |

LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY

| Fiscal Affairs Policies | | | |
|---|---|---|---|
| **Policy Name** | **Last Effective Date** | **Expiration Date** | **Time Expired** |
| 03.01.01 Expenditures of All Funds Administered | June 24, 2009 | Aug 31, 2012 | 7 Years 3 Months |
| 03.01.02 Entertainment Expenditures | June 24, 2009 | Aug 31, 2012 | 7 Years 3 Months |
| 03.01.05 Financial Exigency | Oct 23, 2009 | Sept 1, 2012 | 7 Years 2 Months |
| 03.02.01 Purchasing Guidelines | June 24, 2009 | Aug 31, 2012 | 7 Years 3 Months |
| 03.02.02 Code of Conduct - Procurement Responsibilities | June 24, 2009 | Aug 31, 2012 | 7 Years 3 Months |
| 03.02.03 Purchase of Goods, Materials and Supplies through the Purchasing Department | June 24, 2009 | Aug 31, 2012 | 7 Years 3 Months |
| 03.02.04 Allowances for Communication Devices | June 24, 2009 | Aug 31, 2012 | 7 Years 3 Months |
| 03.02.05 Contracting with Historically Underutilized Businesses | April 16, 2010 | May 1, 2013 | 6 Years 6 Months |
| 03.02.06 Direct Pay Vouchers | April 16, 2010 | May 1, 2013 | 6 Years 6 Months |
| 03.02.07 Advance Payment for Goods | April 16, 2010 | May 1, 2013 | 6 Years 6 Months |
| 03.02.08 Prompt Payment and Payment Scheduling | April 16, 2010 | May 1, 2013 | 6 Years 6 Months |
| 03.02.09 Procurement Card | April 16, 2010 | May 1, 2013 | 6 Years 6 Months |
| 03.02.10 Travel Paid from State-Appropriated Funds | July 21, 2010 | June 1, 2013 | 6 Years 5 Months |
| 03.02.11 Travel Paid from Local Fund | April 16, 2010 | May 1, 2013 | 6 Years 6 Months |
| 03.02.12 Individual Travel Card | April 16, 2010 | May 1, 2013 | 6 Years 6 Months |
| 03.02.13 Departmental and Multi-User Travel Card | April 16, 2010 | May 1, 2013 | 6 Years 6 Months |
| 03.02.14 Centrally Billed Travel Cards | April 16, 2010 | May 1, 2013 | 6 Years 6 Months |
| 03.02.15 Travel Card | April 16, 2010 | May 1, 2013 | 6 Years 6 Months |

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

## Fiscal Affairs Policies

| Policy Name | Last Effective Date | Expiration Date | Time Expired |
|---|---|---|---|
| 03.03.01 The Planning Budgeting Process | June 24, 2009 | Aug 31, 2012 | 7 Years 3 Months |
| 03.03.03 Repair and Construction Funds | June 24, 2009 | Aug 31, 2012 | 7 Years 3 Months |
| 03.03.04 Higher Education Assistance Funds | June 24, 2009 | Aug 31, 2012 | 7 Years 3 Months |
| 03.03.05 Tuition, Fees, and Charges | June 24, 2009 | Aug 31, 2012 | 7 Years 3 Months |
| 03.04.01 Direct Deposits of Salaries | July 24, 2015 | Sept 1, 2018 | 1 Year 2 Months |
| 03.04.02 Payroll Check Distribution | Nov 23, 2009 | May 1, 2012 | 7 Years 6 Months |
| 03.04.03 Payroll Deductions | Nov 23, 2009 | May 1, 2012 | 7 Years 6 Months |
| 03.05.01 Accepting and Handling Credit and Debit Card Payments | August 2013 | Sept 2016 | 3 Years 2 Months |
| 03.07.03 Expenditures and Expenditure Authority | Nov 23, 2009 | May 1, 2012 | 7 Years 7 Months |
| 03.07.04 Official Functions and Discretionary Expenditures | Nov 23, 2009 | May 1, 2012 | 7 Years 7 Months |
| 03.07.06 Emergency and Exceptional Manual Checks from Imprest Account | June 24, 2009 | Aug 31, 2012 | 7 Years 4 Months |
| 03.07.08 Physical Inventory of Goods for Resale, Manufacture, or Repair | June 24, 2009 | Aug 31, 2012 | 7 Years 4 Months |
| 03.07.10 Property Management | June 24, 2009 | Aug 31, 2012 | 7 Years 4 Months |
| 03.08.05 Employee Financial Responsibility | June 24, 2009 | Aug 31, 2012 | 7 Years 4 Months |
| 03.08.07 Student Refunds | Aug 20, 2010 | May 1, 2013 | 6 Years 7 Months |
| 03.08.08 Return of Title IV Funds & Post-Withdrawal Disbursement Policy | No effective date | No effective date | ∞ |

LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY

| Operational Services Policies | | | |
|---|---|---|---|
| Policy Name | Last Effective Date | Expiration Date | Time Expired |
| 04.01.01 Facilities Acquisition, Construction, or Renovation | June 24, 2009 | March 1, 2012 | 7 Years 8 Months |
| 04.01.02 Selection of Architectural and Engineering Firms | June 24, 2009 | Aug 31, 2012 | 7 Years 4 Months |
| 04.01.03 Facilities, Rehabilitation, Repair, Alteration and Construction | Oct 23, 2009 | Oct 1, 2012 | 7 Years 2 Month |
| 04.02.01 Warehouse Operations Policies and Procedures | Aug 20, 2010 | Oct 1, 2013 | 6 Years 2 Month |
| 04.03.01 Fire and Physical Safety | June 24, 2009 | June 1, 2012 | 7 Years 6 Months |
| 04.04.01 Police Standards | June 24, 2009 | June 1, 2012 | 7 Years 6 Months |
| 04.04.02 Police Officer Commissioning | June 24, 2009 | June 1, 2012 | 7 Years 6 Months |
| 04.04.03 Missing Persons | Feb 12, 2010 | Sept 1, 2013 | 6 Years 3 Months |
| 04.04.04 Peace Officer Proficiency Compensation | April 16, 2010 | Sept 1, 2013 | 6 Years 3 Months |
| 04.04.05 Closed Circuit Television Monitoring and Recording Policy | Sept 28, 2011 | Sept 1, 2014 | 5 Years 3 Months |
| 04.05.01 Records Management Program | July 22, 2010 | Sept 1, 2013 | 6 Years 3 Months |
| 04.06.08 Change Management Policy | Feb 18, 2011 | Sept 1, 2014 | 5 Years 3 Months |
| 04.06.10 Email Policy | Feb 18, 2011 | Sept 1, 2014 | 5 Years 3 Months |
| 04.06.11 Incident Management Policy | Feb 18, 2011 | Sept 1, 2014 | 5 Years 3 Months |
| 04.06.19 Portable Computing Policy | Feb 18, 2011 | Sept 1, 2014 | 5 Years 3 Months |
| 04.06.27 Vendor Access Policy | Feb 18, 2011 | Sept 1, 2014 | 5 Years 3 Months |
| 04.06.29 Campus Carry Policy | Aug 1, 2016 | Sept 1, 2019 | 3 Months |

LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY

# VII. CAUSES OF ACTION

## A.   VIOLATION OF TITLE II, 42 U.S.C. §12101 *et seq.*

**355.**   Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraph 1 through 354 above and incorporates them all here as though fully set forth.

**356.**   The disability-based discrimination and retaliation articulated in this complaint was so severe, pervasive, and objectively offensive that it deprived Plaintiff of equal access to Defendants Federally funded educational opportunities, resources, programs and/or benefits provided by the University.

**357.**   Defendant, through its agents, students, faculty, staff, employees and/or administrators created, perpetuated and subjected Plaintiff to a hostile educational environment in violation of Title II, 42 U.S.C. §12101 *et seq.* because:

    **I.**    Plaintiff was member of a protected class;
    **II.**    Plaintiff was subjected to disability-based discrimination in the form of exclusion, harassment and slurs such as "PTSD is for while folk";
    **III.**    Plaintiff was subjected to this harassment based on her disability (PTSD); and
    **IV.**    Plaintiff was subjected to a hostile education environment created by the Defendant's lack of policies and procedures and/or its custom to ignore its own policies and policies and Defendant's failure to properly investigate and/or address the disability discrimination and subsequent harassment.

**358.**   Defendant and its officials had actual knowledge of the disability discrimination and harassment since Thursday, December 20, 2018 but failed to investigate and/or discipline Plaintiff's discriminators in a timely manner and consistent with Federal and State legislative promulgations.

**359.** The Defendant's failure to promptly and appropriately respond to the alleged disability discrimination harassment resulted in Plaintiff, on the basis of her disability, being excluded from participation, in, being denied the benefits of, and being subjected to discrimination in the Defendant's Federally funded educational programs COSET and H-LSAMP.

**360.** Defendant neglected to take immediate, effective remedial steps to resolve the complaints of disability harassment and discrimination and instead acted with deliberate indifference toward Plaintiff.

**361.** Defendant persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiff.

**362.** Defendant, through its administrators, policing agents and students engaged in a pattern and practice of behavior designed to discourage, and which did in fact discourage, Jane—who had been harassed for her disability—from seeking protection and from seeking to have disability complaints of harassment and discrimination from being fully investigated.

**363.** TSU Title II/ADA Policy MAPP 02.05.15 and/or practice constitutes disparate treatment of persons with disabilities like Jane and has had a disparate impact on disabled participants in general.

**364.** Plaintiff has suffered financial loss, emotional distress, psychological damage, and her character and standing in the community has suffered from the harassment fostered as a direct and proximate result of Defendant's deliberate indifference to her rights under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 *et seq.*

## B.    VIOLATION OF SECTION 504, 29 U.S.C. §794 *et seq.*

**365.** Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraph 1 through 354 above and incorporates them all here as though fully set forth.

**366.** The disability-based discrimination and retaliation articulated in this complaint was so severe, pervasive, and objectively offensive that it deprived Plaintiff of equal access to Defendants Federally funded educational opportunities, resources, programs and/or benefits provided by the University.

**367.** Defendant, through its agents, students, faculty, staff, employees and/or administrators created, perpetuated and subjected Plaintiff to a hostile educational environment in violation of Section 504, 29 U.S.C. §794 because:

    **I.**    Plaintiff was member of a protected class;

    **II.**    Plaintiff was subjected to disability-based discrimination in the form of exclusion, harassment and slurs such as "PTSD is for while folk";

    **III.**    Plaintiff was subjected to this harassment based on her disability (PTSD); and

    **IV.**    Plaintiff was subjected to a hostile education environment created by the Defendant's lack of policies and procedures and/or its custom to ignore its own policies and policies and Defendant's failure to properly investigate and/or address the disability discrimination and subsequent harassment.

**368.** Defendant and its officials had actual knowledge of the disability discrimination and harassment since Thursday, December 20, 2018 but failed to investigate and/or discipline Plaintiff's discriminators in a timely manner and consistent with Federal and State legislative promulgations.

**369.** The Defendant's failure to promptly and appropriately respond to the alleged

disability discrimination harassment resulted in Plaintiff, on the basis of her disability, being excluded from participation, in, being denied the benefits of, and being subjected to discrimination in the Defendant's Federally funded educational programs COSET and H-LSAMP.

**370.** Defendant neglected to take immediate, effective remedial steps to resolve the complaints of disability harassment and discrimination and instead acted with deliberate indifference toward Plaintiff.

**371.** Defendant persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiff.

**372.** Defendant, through its administrators, policing agents and students engaged in a pattern and practice of behavior designed to discourage, and which did in fact discourage, Jane—who had been harassed for her disability—from seeking protection and from seeking to have disability complaints of harassment and discrimination from being fully investigated.

**373.** TSU Title II/ADA Policy MAPP 02.05.15 and/or practice constitutes disparate treatment of persons with disabilities like Jane and has had a disparate impact on disabled participants in general.

**374.** Plaintiff has suffered financial loss, emotional distress, psychological damage, and her character and standing in the community has suffered from the harassment fostered as a direct and proximate result of Defendant's deliberate indifference to her rights under Section 504 of the Rehabilitation Act of 1973, as amended ("the Rehabilitation Act"), 29 U.S.C. §794.

## C.   VIOLATION OF TITLE IV 20 U.S.C. § 1681, *et. seq.*

**375.**   Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraph 1 through 354 above and incorporates them all here as though fully set forth.

**376.**   The race, color, national origin discrimination and retaliation articulated in this complaint was so severe, pervasive, and objectively offensive that it deprived Plaintiff of equal access to Defendants Federally funded educational opportunities, resources, programs and/or benefits provided by the University.

**377.**   Defendant, through its agents, students, faculty, staff, employees and/or administrators created, perpetuated and subjected Plaintiff to a hostile educational environment in violation of Title VI, 42 U.S.C. 2000d *et seq.* because:

   I.     Plaintiff was member of a protected class;
   II.    Plaintiff was subjected to race, color, national origin discrimination in the form of exclusion, harassment and slurs such as "PTSD is for while folk";
   III.   Plaintiff was subjected to this limited educational resources and assistance based on her race and national origin (American); and
   IV.    Plaintiff was subjected to a hostile education environment created by the Defendant's lack of policies and procedures and/or its custom to ignore its own policies and policies and Defendant's failure to properly investigate and/or address the race discrimination and subsequent harassment.

**378.**   Defendant and its officials had actual knowledge of the race/national origin discrimination and harassment since Spring 2019 but failed to investigate and/or discipline Plaintiff's discriminators in a timely manner and consistent with Federal and State legislative promulgations.

**379.** The Defendant's failure to promptly and appropriately respond to the alleged race discrimination harassment resulted in Plaintiff, on the basis of her race, being excluded from participation, in, being denied the benefits of, and being subjected to discrimination in the Defendant's Federally funded educational programs COSET and H-LSAMP.

**380.** Defendant neglected to take immediate, effective remedial steps to resolve the complaints of race exclusion and discrimination and instead acted with deliberate indifference toward Plaintiff.

**381.** Defendant persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiff.

**382.** Defendant, through its administrators, policing agents and students engaged in a pattern and practice of behavior designed to discourage, and which did in fact discourage, Jane—who had been discriminated for her race and national origin—from seeking protection and from seeking to have race complaints of exclusion and discrimination from being fully investigated.

**383.** Texas Southern's Title VI policy or lack thereof and/or practice constitutes disparate treatment of persons of protected race like Jane and has had a disparate impact on participants of protected classes of race in general.

**384.** Plaintiff has suffered financial loss, emotional distress, psychological damage, and her character and standing in the community has suffered from the harassment fostered as a direct and proximate result of Defendant's deliberate indifference to her rights under Title VI of the Civil Rights Act 1964 ("Title VI"), 42 U.S.C. 2000d *et seq.*

## D.   VIOLATION OF TITLE IX 20 U.S.C. § 1681, *et. seq.*

**385.**   Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraph 1 through 354 above and incorporates them all here as though fully set forth.

**386.**   The sexual harassment, sexual violence, sexual assault, sex-based discrimination and retaliation articulated in this complaint was so severe, pervasive, and objectively offensive that it deprived Plaintiff of equal access to Defendants Federally funded educational opportunities, resources, programs and/or benefits provided by the University.

**387.**   Defendant, through its agents, students, faculty, staff, employees and/or administrators created, perpetuated and subjected Plaintiff to a hostile educational environment in violation of Title IX, 20 U.S.C. 1681 because:

    **I.**   Plaintiff was member of a protected class;
    **II.**   Plaintiff was subjected to sex-based discrimination in the form of exclusion, harassment, slurs and acts such as "sexual assault";
    **III.**   Plaintiff was subjected to this limited educational resources and assistance based on her sex (female); and
    **IV.**   Plaintiff was subjected to a hostile education environment created by the Defendant's lack of policies and procedures and/or its custom to ignore its own policies and policies and Defendant's failure to properly investigate and/or address the sex-based discrimination and subsequent harassment.

**388.**   Defendant and its officials had actual knowledge of the sex-based discrimination and harassment since March 20, 2018 but failed to investigate and/or discipline Plaintiff's discriminators in a timely manner and consistent with Federal and State legislative promulgations.

**389.** The Defendant's failure to promptly and appropriately respond to the alleged sex-based discrimination harassment resulted in Plaintiff, on the basis of her sex, being excluded from participation, in, being denied the benefits of, and being subjected to discrimination in the Defendant's Federally funded educational programs COSET and H-LSAMP.

**390.** Defendant neglected to take immediate, effective remedial steps to resolve the complaints of sex-based violence, harassment, exclusion and discrimination and instead acted with deliberate indifference toward Plaintiff.

**391.** Defendant persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiff.

**392.** Defendant, through its administrators, policing agents and students engaged in a pattern and practice of behavior designed to discourage, and which did in fact discourage, Jane—who had been discriminated for her sex—from seeking protection and from seeking to have sex-based complaints of exclusion and discrimination from being fully investigated.

**393.** Texas Southern's Title IX policy or lack thereof and/or practice constitutes disparate treatment of persons of protected race like Jane and has had a disparate impact on participants of protected classes of sex in general.

**394.** Plaintiff has suffered financial loss, emotional distress, psychological damage, and her character and standing in the community has suffered from the harassment fostered as a direct and proximate result of Defendant's deliberate indifference to her rights under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §1681 *et seq.*

## E.   TEXAS TORT LAW - Negligence

**395.** Defendant owed Plaintiff a duty of reasonable care.

**396.** Defendant breached these duties in a multitude of ways, including:

V.    Failing to properly hire, train and retain officers, staff and faculty as to proper methods to deal with reports of sexual harassment, sexual abuse, investigate same and accommodate victims in a manner that would permit them to, without undue hindrance, complete their higher education;

VI.    Failing to properly and timely report incidents of claims sexual harassment and/or sexual assault;

VII.    Failing to provide adequate counseling an assistance to victims of sexual harassment and/or sexual assault;

VIII.    Failing to adequately monitor and supervise departments to ensure compliance with protections and standards for sexual harassment and/or sexual assault prevention, reporting and investigation;

IX.    Failing to discover, develop and/or implement basic safeguards designed to prevent and/or minimize incidents of sexual harassment and assault;

X.    Failing to investigate and/or monitor persons accused of sexual harassment and/or sexual assault to ensure additional events do not occur;

XI.    Failing to adopt and implement adequate safeguard to prevent known sexual harassment from occurring on campus;

XII.    Failing to provide adequate staff, with proper training, to counsel and assist victims of sexual harassment and/or sexual assault;

XIII.    Failing to adopt education programs to promote awareness of sexual harassment and/or sexual assault;

XIV.    Failing to adopt and periodically review procedures to make sure they are adequate to address complaints of serious sexual misconduct;

XV.    Failing to make the goal of protecting the campus community from sexual assaults and harassment an integral part of the institution's day-to-day mission of providing a safe and secure learning and working environment.

**397.** Defendant, through its agents, supervisors, or employees discriminated against

Plaintiff, which led to the loss and impairment in whole or part, educational rights and

privileges, opportunities and/or terms and conditions of Plaintiff's scholastic alliance

membership.

**398.** The above-described acts on Defendant's part were committed with actual malice and/or in reckless disregard of Plaintiff's Federally protected civil and constitutional rights.

**399.** The above-described acts on Defendant's part caused Plaintiff substantial injury and damage.

# VIII. JURY TRIAL DEMAND

**400.** Plaintiff requests that all actions aforementioned in this petition and in any amended complaint thereafter be heard before a jury.

# IX. DAMAGES

**401.** Defendant's conduct constitutes violations of statutory and/or common law. Such unlawful conduct seriously affected Plaintiff in her education and future potential employment contingent upon her membership in the LSAMP scholastic alliance. Because of Defendant's unlawful conduct, Plaintiff has suffered, suffers, and will continue to suffer financial loss, humiliation, mental anxiety and stress, and other damages. Plaintiff has suffered direct injury as a proximate result of the unlawful discriminatory practices, policies and procedures of Defendant. Accordingly, Plaintiff seeks all general, special, incidental and consequential damages in an amount to be proved at trial.

**402.** Because of Defendant's unlawful and tortious conduct, it has been necessary for Plaintiff to present these causes and claims in Pro Se or Pro Se Litigant to make known

to the Courts the Defendants heinous unconstitutional operations and practices.

**403.** Additionally, Plaintiff has incurred out-of-pocket expenses, which include financial losses, damages, hinderances and other expenses to preserve her ability to earn a living. Accordingly, Plaintiff seeks all general, special, incidental and consequential damages as shall be proven at trial.

**404.** Further, Plaintiff seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the marketplace or, alternatively, the statutory rate of interest because of the delay in receiving the damages and to avoid unjust enrichment to Defendant. Plaintiff also seeks post-judgment interest at the maximum rate allowed by law in the event that Defendant does not promptly tender damages assessed against them and to avoid unjustly enriching Defendant.

# X. PRAYER

WHEREFORE, premises considered, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have judgment against Defendant for:

**A.** Permanent injunction enjoining Defendant, its agents, successors, employees, and those acting in consort with Defendant from engaging in any practice which discriminates on the basis of sex, race, national origin, disability and protected complaints.

**B.** All damages to which Plaintiff may be entitled pursuant to this Original Complaint, or any amendment(s) thereto, including but not limited to back pay or scholarship loss, reinstatement or front pay in lieu of reinstatement, statutory relief at law, and equity;

**C.**     Compensatory damages for pain and mental anguish in the past and future;

**D.**     Reasonable filing fees, with conditional awards in the event of appeal;

**E.**     Pre-judgment interest at the highest rate permitted by law;

**F.**     Post-judgment interest from the judgment until paid at the highest rate permitted by law;

**G.**     Costs of court and expert witness fees incurred by Plaintiff in the preparation and prosecution of this action; and

**H.**     Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Original Complaint or by any amendment hereto.

**LAWSUIT OF DISCRIMINATION, RETALIATION AND TEXAS TORT PERSONAL INJURY**

Respectfully submitted,

/s/  Jane Doe

Jane Doe
**Plaintiff | Pro Se Litigant**